THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
BRADFORD SIVERLY, Defendant-Appellant.

Second District   No. 2—87—1016

Opinion filed March 2, 1990.

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, for appellant.

Paul A. Logli, State's Attorney, of Rockford (William L. Browers and David A. Bernard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, Bradford Siverly, was found guilty by a jury in the circuit court of Winnebago County of the offenses of murder and attempted murder. (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), 8—4.) He was sentenced to consecutive 28- and 12-year terms of imprison-

ment, respectively, for these convictions.

The defendant charges three errors deprived him of a fair trial. First, the trial court erroneously excluded important testimony offered as nonhearsay state-of-mind evidence. Second, his guilt of the lesser included offense of voluntary manslaughter was improperly conceded by his trial counsel. Third, the burden-of-proof jury instructions for murder and manslaughter were incorrect and amounted to grave, reversible error. We affirm.

The charges against the defendant arose out of the February 12, 1987, fatal stabbing of Lonnie Jenkins, Jr., who was approximately 55 years of age, and the stabbing injury to 15-year-old Douglas Thompson. The decedent, Lonnie Jenkins, was confined to a wheelchair on the date of his death as a result of a progressive muscle disorder. Jenkins was also a seller of marijuana.

Daniel Sreenan, who was then living at Jenkins' house in Rockford, testified for the prosecution that the defendant came to Jenkins' house twice on the morning of the incident. The first time, at about 10 a.m., the defendant had a friendly, 10-minute conversation with Jenkins and then left to get his wallet. The defendant apparently was purchasing some marijuana from Jenkins, but, when Sreenan brought out the drug at Jenkins' bidding, the defendant discovered that he did not have his wallet.

The defendant returned to the house about one-half hour later, passing by Sreenan, who was then washing a car in the driveway. Shortly after the defendant reentered the house, Douglas Thompson and his 18-year-old brother, Danny, arrived, and Sreenan sent Douglas into the house to obtain a chamois. Moments later, a scream and thumping noises were heard coming from the house. Rushing inside, Sreenan found Jenkins injured on the bathroom floor and was told by the defendant that Jenkins and Douglas Thompson had gotten "into a scuffle." Sreenan then heard Douglas Thompson say, "The son-of-a-bitch stabbed me."

According to Douglas Thompson's testimony, he was unexpectedly stabbed in the back of the neck while he was looking for the chamois in a metal closet on the porch of the house. The defendant then covered Thompson's mouth with his hand and dragged him into a bedroom. Thompson testified the defendant was bent over him in position to stab him again and that he said to the defendant, "Please don't kill me." At that point, Sreenan and Danny Thompson came into the house, and the defendant jumped up and hid the knife when he heard them. Danny Thompson scuffled with the defendant, trying to prevent him from leaving the house, but Sreenan, who did not yet realize

what had happened, told Danny to let the defendant go. The defendant ran out of the house to his car, which was parked two or three blocks away from Jenkins' house. The defendant testified that he parked that far away because Jenkins felt the police were watching the traffic at his house.

According to the record, when defendant neared his grandmother's house, where he was living with his children, the police were already there, so he went to a friend's house, where the friend advised him to call the police. The defendant called his grandmother instead, and he spoke with a police officer who was there. The defendant agreed to go to his grandmother's house, where the police would be waiting for him. On the way there, he was spotted in his car and was arrested.

The defendant subsequently gave the police two written statements which were read at trial. In his first statement, the defendant claimed he was attacked by a young white male in Jenkins' house—presumably Douglas Thompson—and that he took the knife away from the boy and stabbed him in the back. He then used the knife to stab Jenkins after Jenkins said, "I am going to get you" and leaned out of his wheelchair. The defendant stated that for about three weeks he owed Jenkins $50 from the sale of an ounce of marijuana and had gone to Jenkins' house on February 12 to talk with him about the debt. He was too afraid to tell Jenkins he could not pay him, however, and told him he forgot his wallet instead and left to get it.

In his second statement, given later that same day, the defendant stated that when he returned to Jenkins' house he had with him a kitchen knife from his grandmother's house because he feared Jenkins would get mad when he told him he didn't have the money to pay him. When he told Jenkins that he had no money, Jenkins said, "I guess I am going to have to teach you a lesson." Jenkins then said that he knew where the defendant's daughter goes to school. When the defendant asked if Jenkins was threatening defendant's daughter, Jenkins said, "Well, you will find out." The defendant told Jenkins, "You are not [obscenity] with my family, especially my daughter," and he pulled the knife out of his coat and stabbed Jenkins in the back either once or twice. Jenkins fell out of the wheelchair onto the floor, and the defendant told him, "You are not messing with my daughter." The defendant then stabbed Jenkins a couple more times. When he encountered Douglas Thompson on the porch by the metal cabinet, the defendant thought Thompson might go in the house and see what he had done. The defendant stabbed Thompson in the back and dragged him across the living room and threw him on the bed in the

bedroom. He encountered Sreenan and Danny Thompson as he was leaving and told them something happened, that he had "gone nuts" when Jenkins threatened his kids. Thompson grabbed the defendant, but he pushed Thompson away, ran outside and was later arrested as he related in his first statement.

Lonnie Jenkins died as a result of stab wounds to the chest. He sustained five or six wounds in his upper chest and back. Douglas Thompson's carotid artery on the right side of his neck was 80% severed; emergency surgery saved his life.

At trial, the defendant testified that he had custody of his two children, Stacey, age 10, and Tracey, age five, after his wife ran off with his grandfather in 1985, when the defendant and his grandmother discovered them in bed together. His wife and grandfather returned after two weeks, but ultimately left again after about one month, and they presently reside together. The defendant stated that he knew Lonnie Jenkins for more than 10 years and that he bought marijuana from him about twice a month, sometimes on credit. The defendant testified he usually carried a pocketknife with him when he went to Jenkins' house because he was afraid of the people who came there. He could not find his pocketknife when he returned to his grandmother's house after having been to Jenkins' house the first time, so he took the kitchen knife because he was afraid of Jenkins and the things he told him "would happen to people that owed him money and didn't come up with it." When the defendant returned to Jenkins' house, Jenkins asked him if he had the money he owed him. The defendant replied he did not but that he would be able to get it shortly. Jenkins told the defendant Jenkins waited long enough and that he would have to deal with it in his own way and that he knew where the defendant's children went to school. Defendant testified he asked Jenkins what he meant by that, and Jenkins told him he would find out. The defendant stated Jenkins then began wheeling himself towards the bathroom. The defendant told Jenkins he was not messing with defendant's kids, and he took out the knife and stabbed Jenkins. He testified he did not remember stabbing Jenkins more than once because he "more-or-less snapped." The defendant also testified he did not remember stabbing Douglas Thompson or Thompson saying anything to him, but he did remember dragging Thompson through the living room and throwing him in the bedroom.

The defendant first contends he was denied a fair trial because he was not permitted to testify as to his reason for fearing the threat made against his children by Lonnie Jenkins. Specifically, he claims he was not allowed to testify to previous conversations between himself

and Jenkins regarding what happens to those who fail to pay their debts to Jenkins. Inasmuch as such conversations were being offered to show their effect on his state of mind and not for the truth of the matter asserted, the defendant contends they were relevant to the issue of whether he stabbed Jenkins "with malice aforethought" and that he is entitled to a new trial.

The State responds that assuming, *arguendo*, the alleged conversations took place and were truthful, they and the testimony offered at trial would not, as a matter of law, have risen to the level of serious provocation needed to reduce the defendant's murder conviction of voluntary manslaughter. Thus, the State argues the defendant cannot claim prejudice due to the excluded evidence. We agree.

■■■ Preliminarily, we note the defendant provides no record references to any offers of proof which were made regarding the substance of any of the excluded conversations. Without such offers of proof, this court would have no way of determining whether the exclusions were erroneous and prejudiced the defendant to the extent that a new trial is warranted. (See *People v. Wallace* (1966), 35 Ill. 2d 620; *People v. Brown* (1986), 150 Ill. App. 3d 535.) That aside, it has been held that out-of-court statements offered to show the resultant effect on the listener's state of mind are not hearsay. (*People v. Campbell* (1987), 161 Ill. App. 3d 147, 157.) "Similarly, threats made to the defendant bearing on the reasonableness of his apprehension of danger, or which conversely provide a reason for conduct, are not hearsay when offered for such purpose." M. Graham, Cleary & Graham's Handbook of Illinois Evidence, §801.5, at 516-17 (4th ed. 1984).

■■■ As the State argues, however, even assuming the defendant had knowledge of Jenkins' probable "muscle" collection tactics and, thus, reason to believe his threats against his children, the Illinois Supreme Court has recognized only four categories of "serious provocation" as that term is used in the voluntary manslaughter statute. They are (1) substantial physical injury or assault, (2) illegal arrest, (3) mutual quarrel or combat, and (4) adultery with the defendant's spouse. (*People v. Chevalier* (1989), 131 Ill. 2d 66, 71; *People v. Fausz* (1983), 95 Ill. 2d 535, 539; *People v. Wiley* (1989), 185 Ill. App. 3d 1097, 1103.) "Serious provocation is conduct sufficient to excite an intense passion in a reasonable person." (Ill. Rev. Stat. 1985, ch. 38, par. 9—2(a)(2).) Words alone, no matter how aggravated, abusive, opprobrious, or indecent, are not sufficient to constitute "serious provocation." (*Wiley*, 185 Ill. App. 3d at 1103; *People v. Neal* (1983), 112 Ill. App. 3d 964, 967.) No matter how intense the passion on the part of the slayer, he will not be relieved of liability for murder unless the

passion is engendered by a serious provocation which the law recognizes as being reasonably adequate. (*People v. Nunn* (1989), 184 Ill. App. 3d 253, 275.) Further, the provocation must be proportionate to the manner in which the accused retaliates (*People v. Pugh* (1989), 187 Ill. App. 3d 860, 868; *People v. Stanley* (1986), 146 Ill. App. 3d 912, 920), and where a defendant's retaliation is disproportionate to the victim's provocation, the crime committed is murder, not manslaughter, especially if the defendant accomplishes the offense with a deadly weapon. *Pugh*, 187 Ill. App. 3d at 868.

■ Thus, even if the excluded evidence here would have tended to establish that the defendant believed Jenkins could carry through his veiled threat to defendant's children, Jenkins' threat did not constitute the serious provocation necessary to allow the jury to find the defendant guilty of voluntary manslaughter rather than murder. Accordingly, the court's error, if any, in excluding such evidence did not prejudice the outcome of the defendant's trial.

The defendant next contends he was deprived of the effective assistance of counsel where there is no indication in the record that he agreed to the concession of his guilt of voluntary manslaughter made by trial defense counsel during opening and closing argument. In opening argument, counsel told the jury: "There is no dispute as to the fact that my client, Brad Siverly, *** did kill Lonnie Jenkins." In closing, counsel argued: "And I believe after reviewing everything and carefully considering facts and the law as the Judge describes it to you, you could very likely and in good conscious [*sic*] and doing your duty as a jury, convict him of voluntary manslaughter which is a serious felony. *** [B]ut there is no question in my mind he is not guilty of murder based on the evidence." Defendant relies primarily on *People v. Hattery* (1986), 109 Ill. 2d 449, in support of his argument.

In *Hattery*, the court found the defendant was deprived of his sixth amendment right to the effective assistance of counsel where his trial attorneys conceded during the guilt-innocence phase of the trial that the jury would find him guilty of murder and would find him eligible for the death penalty and that the *only* issue to be decided by the jury was whether he should receive the death penalty. The court reasoned that counsel's trial strategy—showing that the defendant was guilty of murder but undeserving of the death penalty—was totally at odds with his earlier plea of not guilty and the record was silent as to whether the defendant had consented to his attorneys' strategy. In the absence of an adequate showing of the defendant's knowing and intelligent consent to such strategy, the court found counsels' actions deprived the defendant of the right to have the issue

of his guilt or innocence presented to the jury as an adversarial issue, and, thus, there was a denial of sixth amendment rights that made the adversarial process itself presumptively unreliable. (*Hattery*, 109 Ill. 2d at 460-64.) The defendant also cites *People v. Calhoun* (1986), 144 Ill. App. 3d 829, and *People v. Woods* (1986), 151 Ill. App. 3d 687, in support of his position on this issue.

The State asserts *Hattery* does not support the broad interpretation ascribed to it by the defendant, to wit: that whenever defense counsel admits his client's guilt without his client's on-the-record acquiescence, it amounts to ineffective assistance of counsel. It argues the instant cause is distinguishable from *Hattery* and *Woods* and points out that *Calhoun* has been criticized in *People v. Weger* (1987), 154 Ill. App. 3d 706, as misapplying *Hattery*. It argues an admission of guilt to less than all the elements of a crime charged where the evidence of the defendant's guilt is overwhelming and where counsel otherwise provides a vigorous defense has been recognized as good defense strategy in *Weger* and *People v. Gill* (1988), 169 Ill. App. 3d 1049. Assuming, *arguendo*, counsel's actions were erroneous, the State alternatively urges such error was harmless in light of the strength of the State's case.

Although the instant issue was not raised in the defendant's post-trial motion, the Illinois Supreme Court has approved review under the plain error doctrine where, as here, defendant's trial counsel prepared and argued the post-trial motion. *People v. Chandler* (1989), 129 Ill. 2d 233, 241-42.

Generally, a defendant must meet the two-pronged test announced in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, in order to establish a deprivation of the sixth amendment right to the effective assistance of counsel. In rare cases, however, ineffectiveness of counsel will be presumed without application of the *Strickland* test. Where counsel *entirely* fails to subject the prosecution's case to meaningful adversarial testing, there has been a denial of sixth amendment rights that makes the adversary process itself presumptively unreliable. *United States v. Cronic* (1984), 466 U.S. 648, 659, 80 L. Ed. 2d 657, 668, 104 S. Ct. 2039, 2047.

*Strickland* requires proof (1) that counsel's performance was deficient by having made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the sixth amendment, and (2) that counsel's deficiencies prejudiced the defendant. (*Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; *Chandler*, 129 Ill. 2d at 242.) Errors in counsel's trial strategy,

judgment or tactics alone will not render counsel's performance deficient (*People v. Hillenbrand* (1988), 121 Ill. 2d 537, 548), and prejudice may be established by proof that there is a reasonable probability that, but for counsel's deficient conduct, the outcome of the proceeding would have been different (*People v. Barnard* (1984), 104 Ill. 2d 218, 237-38; *People v. Cobb* (1989), 186 Ill. App. 3d 898, 917).

■■ In line with the State's argument, the court in *People v. Johnson* (1989), 128 Ill. 2d 253, 269, stated that *Hattery* does not hold that it is *per se* ineffectiveness of counsel whenever an attorney concedes his client's guilt to offenses in which there is overwhelming evidence of that guilt but fails to show on the record consent by defendant. The *Johnson* court also noted that *Hattery* is to be narrowly construed. (*Johnson*, 128 Ill. 2d at 269.) The *Cronic* "presumption" standard was met in *Hattery* due to counsel's unequivocal concession of the defendant's guilt to the murder charge, the only charge brought against the defendant.

■■ The presumption standard utilized in *Hattery* has not been met here, however, where the defendant was charged with murder and attempted murder, and counsel presented a vigorous theory of defense to the murder charge, *i.e.*, that the defendant was acting under serious provocation engendered by the victim. Counsel did not concede all the elements of the murder offense as counsel did in *Hattery*, and counsel's actions here were not inconsistent with the defendant's plea of not guilty to the offense of murder. Consequently, where counsel held the prosecution to its heavy burden of proof beyond a reasonable doubt, a showing of the defendant's consent to counsel's trial strategy was not necessary. See *Hattery*, 109 Ill. 2d at 464-65; see also *Johnson*, 128 Ill. 2d at 270-71.

*People v. Woods* and *People v. Calhoun*, cited by the defendant, are distinguishable. In *Woods*, the defendants were found guilty of theft and burglary. In closing argument, defense counsel conceded defendant's guilt of the theft offense when he argued to the jury that it was within its province to determine that this is "merely a theft, not burglary." Because there was no effective way to argue that the defendants, by opening the car hood and removing the battery, were guilty of theft but not of burglary, and there was no showing that the defendants agreed to concede their guilt of any offense charged, the court reversed their convictions and remanded for a new trial. *Woods*, 151 Ill. App. 3d at 694.

Similarly, in *Calhoun*, a prosecution for murder and two armed robberies, defense counsel conceded in opening and closing statements and in the presentation of evidence his client's guilt of the armed rob-

beries but not the murder, and there was no indication in the record that Calhoun agreed to concede his guilt of the armed robberies. Accordingly, under *Hattery*, the court reversed his convictions of those robberies and remanded the cause.

As noted by the State, the court in *People v. Weger* agreed *Woods* was correctly decided under *Hattery* because counsel's conduct in that case was so deficient, but it felt that *Calhoun* misapplied the *Hattery* case. The *Weger* court considered that conceding a client's guilt on a less serious offense of a multicount indictment where there exists overwhelming evidence of that lesser offense and contesting the more serious offense could be viewed as good defense strategy inasmuch as it enhances counsel's credibility with the trier of fact when it comes to the charges for which a legitimate defense exists. This view was echoed in *People v. Gill* (1988), 169 Ill. App. 3d 1049, 1055, where the court rejected the defendant's claim of ineffective assistance of counsel. In that case, counsel conceded the defendant's guilt of robbery, a lesser-included offense of armed robbery, in an attempt to remove the defendant from the ambit of a life sentence as an habitual offender. See also *Johnson*, 128 Ill. 2d at 270.

The evidence here included the defendant's own statements to the police and testimony at trial admitting he stabbed Jenkins and that he did so because he "snapped" and "went nuts," when Jenkins threatened his children. Given this evidence, counsel's concession of the defendant's guilt only to the lesser-included offense of voluntary manslaughter in the hope of avoiding a murder conviction may be viewed as good defense strategy, where counsel otherwise vigorously defended the murder charge. *Cf. People v. Powell* (1987), 159 Ill. App. 3d 1005 (not unreasonable for defense counsel to concede defendant shot three people where defendant did not deny shootings, there was no question regarding defendant's identity, and the only issue was the defendant's intentions during the shootings).

■■ Consequently, ineffectiveness of counsel may not be "presumed" under *Cronic* as it was in *Hattery*. Further, under the first prong of a *Strickland* analysis, counsel's performance here cannot be viewed as deficient, and defendant's claim of the ineffective assistance of counsel must fail. Even absent counsel's concession of the defendant's guilt of voluntary manslaughter, there is no reasonable probability that the result of the defendant's trial would have been different (*People v. Barfield* (1989), 187 Ill. App. 3d 190, 201), considering that the "serious provocation" here is not the type recognized as being reasonably adequate under the voluntary manslaughter statute. *Chevalier*, 131 Ill. 2d at 71; *Fausz*, 95 Ill. 2d at 539; *Wiley*, 185 Ill.

App. 3d at 1103.

In a supplemental brief, the defendant's final contention is that he was deprived of a fair trial because the jury instructions improperly stated the prosecution's burden of proof. In support, he relies on *People v. Reddick* (1988), 123 Ill. 2d 184, in which the supreme court held that when the IPI voluntary manslaughter instructions and the instruction for murder are read together, they erroneously state the burdens of proof on the issues of whether a defendant has acted under either intense passion—which is the case here—or has acted under the unreasonable belief that his action was justified. (Illinois Pattern Jury Instructions, Criminal, Nos. 7.02 (murder), 7.04 (voluntary manslaughter—provocation), 7.06 (voluntary manslaughter—belief of justification) (2d ed. 1981) (IPI Criminal 2d).) He also cites as supplemental authority, *People v. Chevalier* (1988), 167 Ill. App. 3d 790, where this court agreed with the defendant that the jury was improperly instructed and the defendant entitled to a new trial when it received the same two instructions at issue here, IPI Criminal 2d Nos. 7.02 and 7.04. We note that *Chevalier* has since been reversed by the Illinois Supreme Court on the basis *Chevalier* was not prejudiced by the erroneous instructions because the evidence did not, as a matter of law, constitute the serious provocation necessary to reduce the homicide from murder to voluntary manslaughter. *People v. Chevalier* (1989), 131 Ill. 2d 66.

The State similarly contends here that the error, if any, in the instructions was harmless and did not prejudice defendant because the evidence here was insufficient to reduce the defendant's murder conviction to involuntary manslaughter and, thus, the giving of a voluntary manslaughter instruction of any kind—even an erroneous one— would only have benefitted the defendant.

At the outset, we note the State's "benefit to the defendant" argument was rejected in *People v. Brooks* (1988), 175 Ill. App. 3d 136, 142, in light of the supreme court's recognition in *Reddick* of the gravity of the error of not correctly apprising the jury of the State's burden of proof. Also due to the gravity of the error, *Reddick* found the defendant there had not waived the issue by failing to object or proffer alternative instructions at trial or to raise the issue in his post-trial motion. (*Reddick*, 123 Ill. 2d at 198-99.) Defendant here raises the issue for the first time as well, and, per *Reddick*, we proceed to review the issue under the plain error doctrine.

It was stated in *Reddick*:

> "[W]hen read together, [the murder and voluntary manslaughter instructions] erroneously state the burdens of proof on the

issues of whether the defendants acted under either intense passions or unreasonable beliefs that their actions were justified. The voluntary manslaughter instructions indicate that to obtain a voluntary manslaughter conviction the People must prove the existence of one of the alternative mitigating mental conditions which the People contend did not exist. By contrast, the murder instruction makes no mention of the mitigating mental conditions. These instructions essentially assure that, if the jury follows them, the jury cannot possibly convict a defendant of voluntary manslaughter. The reason is that even if a mitigating mental state is proved, it will have been proved by the defendant, not the People.

\* \* \*

The burden-of-proof instructions regarding both voluntary manslaughter and murder \*\*\* were thus incorrect in placing upon the People the burden of proving the existence of intense passion or unreasonable belief in justification. The instructions should have placed upon the People the burden of *disproving* the existence of either of these two states of mind." (Emphasis added.) *Reddick*, 123 Ill. 2d at 194-95, 197.

■■ Based on *Reddick*, which has been applied retroactively (*People v. Brooks* (1988), 175 Ill. App. 3d 136), it is evident the jury here was improperly instructed as to the State's burden of proof. Errors in instructions may be found to be harmless beyond a reasonable doubt, however, where the result of the trial would not have been different if the proper instruction had been given. (*People v. Fierer* (1988), 124 Ill. 2d 176, 187; *People v. Skipper* (1988), 177 Ill. App. 3d 684, 789; *People v. Carter* (1988), 177 Ill. App. 3d 593, 598.) Although the State agreed at trial that the defendant was entitled to have the jury instructed as to manslaughter, the evidence of provocation offered here was, as a matter of law, insufficient to constitute the type of serious provocation necessary to reduce the homicide for murder to voluntary manslaughter. (See, *e.g., Chevalier*, 131 Ill. 2d at 71.) Accordingly, as the State argues, the defendant could not have been prejudiced by the erroneous instructions, and reversal is not warranted. *Chevalier*, 131 Ill. 2d at 76.

For the reasons stated above, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

DUNN and WOODWARD, JJ., concur.