THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DAVID DEATON, Defendant-Appellant.

First District (3rd Division) No. 1--87—2144

Opinion filed October 21, 1992.

Rita A. Fry, Public Defender, of Chicago (Richard E. Gade, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Bill Pistorius, and Steven Klaczynski, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

Following a jury trial, defendant, David Deaton, was convicted of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1) and armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 18—2). Defendant was sentenced to an extended term of 50 years' imprisonment in the Illinois Department of Corrections.

The issues before this court for review are (1) whether defendant's convictions must be reversed, and his cause remanded for a new trial on the basis that the trial court's instructions to the jury concerning murder and voluntary manslaughter were improper pursuant to *People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141; (2) whether the State proved defendant guilty of armed robbery beyond a

reasonable doubt; and (3) whether the trial court abused its discretion when it sentenced defendant to an extended term of 50 years' imprisonment. We affirm.

Before the trial commenced, defendant moved to suppress his inculpatory post-arrest statements. After a hearing, this motion was denied. Defendant then requested a trial separate from one of his codefendants, Wesley Turner, due to the existence of cross-inculpatory statements attributed to Turner. Defendant's motion for a separate trial was granted.

Defendant and Turner each opted for a jury trial. The other codefendant, Adiel Jaime, elected a bench trial. Defendant waived his right to a sentencing jury in the event the case progressed to a capital sentencing hearing. Prior to *voir dire*, the State nol-prossed its charges against defendant for aggravated kidnapping and armed violence.

After the jury was selected and sworn, defendant, Turner and Jaime were tried in a joint trial. The jurors sworn to make findings in defendant's case heard the following evidence. Mary Ortiz, a witness for the State, testified that on September 9, 1985, she and her friend Lucy Rivera were walking on Irving Park Road near Sheridan Road in Chicago, Illinois. Ortiz stated that as she and Rivera approached the intersection of Irving Park Road and Sheridan Road, she saw defendant and Turner across the street.

Ortiz and Rivera then decided to walk through the parking lot behind Byron's Hot Dog Stand on Irving Park Road. Ortiz stated that as she and Rivera walked through the parking lot, they were approached by two men. Ortiz told the court that one of the men asked her for a "date." Ortiz explained that the term "date" was a colloquialism for prostitution. Ortiz testified that Rivera walked away with the man. Ortiz stated that the other man then asked her for a "date," and she responded that she was not a whore. The man then walked across the parking lot and sat down on a fence rail.

Ortiz testified that as she began to walk away, Turner crossed the street and approached the man who propositioned her. She further stated that Turner spoke to the man and that Turner then punched the man. Ortiz testified that she then observed the the victim fall back, regain his balance, and begin to run away from Turner toward the back wall of Byron's Hot Dog Stand. Ortiz testified that Turner chased the victim and tripped him, causing the victim to fall and hit his head on the wall of the hot dog stand. Ortiz testified that Turner then hit the victim, and that immediately thereafter, defendant approached the scene and began to punch and kick the victim. Ortiz

stated that she next observed Turner remove the victim's shoes. Ortiz testified that Jaime then approached the victim and struck him with a soft drink syrup canister. Ortiz told the court that defendant then stabbed the victim as he attempted to stand up.

Ortiz left after defendant stabbed the victim. Ortiz testified that she walked to a building on Kenmore Street where she met Rivera and Jaime. Ortiz testified that shortly thereafter, she and Rivera were approached by defendant and Turner, and that defendant had blood all over his hands, clothes and bandanna. Ortiz stated that defendant then tried to give Rivera the knife, but she refused to accept it. The group then walked down Kenmore Street toward Gordon Terrace. Ortiz testified that defendant tried to give the knife to Rivera again, but that Rivera again refused to accept it. Ortiz told the court that Turner then removed $11 from his pocket which he said belonged to the victim. Ortiz testified that defendant then demanded and was given some of the money.

On cross-examination Ortiz stated that she had dated Jaime for two weeks approximately a year prior to this incident. Ortiz also acknowledged that there were some inconsistencies between her testimony before the grand jury and her testimony at trial. Ortiz' inconsistent testimony, however, concerned the actions of Turner and Jaime. Ortiz' testimony about defendant was consistent.

It was stipulated that the victim, Andres Laapa, was treated at Illinois Masonic Hospital, where he died two days after he was admitted. It was further stipulated that blood samples were obtained from the victim, the metal canister, and defendant's clothing. It was also stipulated that Pamela Fish, a serologist, determined that all of the samples were type O human blood.

Dr. Tae An, a forensic pathologist, testified that he performed an autopsy on the victim. Dr. An first observed two lacerations on the victim's left forehead and three stab wounds on his chest, arm and back. Upon an internal examination, Dr. An noticed that the victim had a large cranial injury which included a skull fracture, a cerebral hemorrhage, a contusion, and brain swelling. Dr. An also observed that the victim's liver was lacerated. Dr. An opined that the victim's death was caused by the cranial injury and multiple stab wounds.

Detective William Baldree testified next. Detective Baldree stated that he inspected the scene of the crime on September 9, 1985, at approximately 2:30 a.m. Detective Baldree testified that the parking lot adjacent to Byron's Hot Dog Stand is in the rear of the building, and that empty soda syrup canisters are stored there. Detective Baldree identified the metal canister he recovered, and a pair of shoes he

found near the rear wall of the hot dog stand. Detective Baldree testified that the canister and the shoes were about 15 feet apart. Detective Baldree further testified that there was blood on the pavement near the shoes, and that there was a second pool of blood on the ground next to the soda canister. Detective Baldree stated that there were marks on the pavement which extended from the canister and the pool of blood to a guard rail fence on the edge of the parking lot. Detective Baldree told the court that there was blood smeared across this fence, across the alley, and into a rear parking area of another restaurant where a third pool of blood was found.

Later that day, at approximately 12:30 p.m., Detective Baldree testified that he and Detectives David Paul and Fred Stone drove to Kaleidoscope, Inc. Kaleidoscope, Inc., was a private institution which provided social services to youth. Detective Baldree stated that he and Detective Stone went inside while Detective Paul remained outside. Detective Baldree testified that once inside, he and Detective Stone had a conversation with Jill Fein, the program director at Kaleidoscope, Inc., and that defendant was then brought into Fein's office, where Detective Baldree read him his *Miranda* rights. Defendant was then placed under arrest and taken outside. Detective Baldree testified that once he, his partner and defendant exited the building, defendant was handcuffed and a knife was recovered from a rear pocket in defendant's pants. Defendant was then driven to the Area 6 police station.

At the station, Detective Baldree took defendant to an interview room and again advised him of his constitutional rights. Defendant was then interviewed. Detective Baldree testified that defendant initially denied any knowledge of or participation in the crime. Detective Baldree stated that he then told defendant that witnesses observed him at the scene of the crime. Detective Baldree also reminded defendant that he had blood on his clothes, and that a knife was found in his pocket. According to Detective Baldree, defendant then admitted that he, Jaime and Turner were present behind Byron's Hot Dog Stand at the time in question. Detective Baldree testified that defendant then told him that Turner hit the victim, knocking him to the ground. Detective Baldree told the court that defendant then stated that the victim attempted to flee, but that Turner chased him and knocked him to the ground again. Detective Baldree testified that defendant told him that Jaime then struck the victim with a large soda syrup canister. Detective Baldree further stated that defendant maintained that he joined in the altercation in order to assist Turner. Detective Baldree testified that defendant then stated that a knife

dropped out of his shirt pocket and someone picked it up and stabbed the victim. Defendant maintained that Turner did not stab the victim because he fled after removing the victim's shoes. Detective Baldree testified that he then told defendant that Jaime could not have stabbed the victim because he could not have managed to swing the canister and stab the victim at the same time. Detective Baldree testified that defendant then admitted that he stabbed the victim two or three times. Detective Baldree further testified that defendant also stated that Jaime took $10 or $11 from the victim before he and Jaime fled the scene. Defendant told Detective Baldree that he and Jaime later met two women on the street before parting ways. Detective Baldree concluded his direct testimony by identifying various articles of clothing worn by defendant at the time of his arrest.

Detective Baldree later summoned Assistant State's Attorney James Andreou to the Area 6 police station. When Assistant State's Attorney Andreou arrived at the station, he interviewed Detective Baldree, questioned witnesses, and read available police reports. He then introduced himself to defendant. After advising defendant of his *Miranda* rights, Assistant State's Attorney Andreou questioned defendant about the stabbing. Assistant State's Attorney Andreou prepared a written summary of this interrogation which defendant read out loud and signed. Assistant State's Attorney Andreou entered his summary into the record. The written statement reads as follows:

"David Deaton is 19 years old and lives at 4735 N. Beacon in Chicago. At about 1:30 a.m. on September 9, 1985, he was with his friend Jaime and they were talking with two girls they knew named Mary and Lucy. They were in a parking lot behind a Hot Dog Stand named 'Byrons' at 1017 W. Irving Park Rd., in Chicago. Two Puerto Rican boys came up to the girls and spoke with them. One of the two walked away with Lucy. The other boy sat down on the parking railing where everyone else was sitting. At that time a young black man came up. His name is Wesley and he is a friend of David Deaton's. Wesley got into an argument with the other Puerto Rican who was sitting on the railing. They began fighting and David got into it to help his friend Wesley. Jaime also got into it. They chased him over towards the back of the Hot Dog stand and Wesley tripped the Puerto Rican. Wesley then left and David and Jaime began to beat and kick the man who had fallen to the ground. Jaime picked up a metal soda pop canister and started to beat the man with it. David Deaton had a pocket knife in his shirt pocket. He pulled it out, opened the blade and stabbed the

man in the chest two or three times. He saw Jaime go through the man's pockets and take out some cash, it amounted to $11 (eleven dollars) and later Jaime gave David $1 (one dollar) for bus fare. They both pulled the man across the alley and left him behind a restaurant so the police wouldn't see him. Later as Jaime and David were walking they saw Mary and Lucy again. David told them what had happened and pulled out the knife. He told him [sic] that he had stabbed the guy and tried to give Lucy the knife to hold for him. Lucy did not want to hold it and gave it back to him. David took the knife and put it back into his pocket. Then David and Jaime left.

David Deaton has been given his rights by the police and the assistant state's attorney and he understands those rights. He also understands that the assistant state's attorney is the lawyer for the People and is not his lawyer. He is making this statement because it is the truth and no threats or promises have been made to him. He has been treated well by the police and the assistant state's attorney and has been allowed to use the bathroom and has been offered something to drink. He understands that if anything in this statement is not correct he can tell the assistant state's attorney and he will correct it. He has read this statement and it has been read to him and it is true and correct. He did not mean to stab the man and he is sorry that he did it."

The State then rested its case.

The defense called three witnesses. First, the defense called Jill Fein. Fein testified that defendant was participating in the alternative lifestyles program at Kaleidoscope, Inc., on that date. Fein stated that she was the supervisor of Darryl Johnson, who was defendant's social worker. Fein testified that her supervisor informed her that the police were looking for defendant. Fein told the court that she saw defendant later that morning and noticed that he was dirty, disheveled and had blood on his hands. Fein stated that she talked to defendant and told him that the police were looking for him and that they were on their way to the center. Fein testified that she asked defendant what was going on but that he was unresponsive.

Next, Darryl Johnson testified that on September 9, 1985, he was employed at Kaleidoscope, Inc., and was defendant's social worker. Johnson testified that defendant arrived at Kaleidoscope, Inc., around 10:15 a.m. and that he was talking to Fein when Johnson first saw him. Johnson stated that defendant appeared distraught and was somewhat unresponsive to Fein's questions. Johnson further testified

that he made three telephone calls to an attorney who had previously represented defendant while the police were in Fein's office.

The defense then called Lori Hamrick. Hamrick testified that she had known defendant for about six years. Hamrick further testified that on September 9, 1985, she lived across the street from Byron's Hot Dog Stand. Hamrick also stated that she worked as a prostitute in the area on that date. Hamrick testified that she witnessed defendant consume alcohol and cocaine at a party held in her apartment around midnight on September 9, 1985.

After the defense rested, the State called Detective Baldree and Assistant State's Attorney Andreou as rebuttal witnesses. Both men testified that they saw no indication that defendant was under the influence of alcohol or drugs when they interviewed him. They further testified that defendant was responsive to their questions.

At the jury instructions conference which followed, the defense asked the court to instruct the jury on self-defense as well as the "serious provocation" and "unreasonable belief of justification" forms of voluntary manslaughter. The prosecutor objected to all three proposed instructions. The court sustained the State's objection to the "serious provocation" form of voluntary manslaughter, but it ruled that instructions would be given on both the "self defense" and "imperfect self-defense" aspects of the "unreasonable belief of justification" form of voluntary manslaughter because defendant testified that he intervened in the altercation in order to assist Turner. The court, thereafter, instructed the jury on murder and voluntary manslaughter pursuant to the then prevailing Illinois Pattern Jury Instructions.

The jury found defendant guilty of murder and armed robbery. Defendant then moved for a new trial but his motion was denied. Defendant waived the eligibility phase of his capital sentencing hearing.

Johnson testified for defendant in mitigation at his sentencing hearing. Johnson told the court that defendant had been admitted to Northwestern Memorial Hospital, where he was diagnosed as having "a borderline personality with a manic depressive tendency," and that defendant was treated with lithium, a drug used to treat manic depressive patients. Johnson further testified that defendant was discharged from the hospital because the Illinois Department of Children and Family Services eliminated funding used to pay for defendant's treatment. Johnson stated that at that time, defendant's treating physician recommended that defendant obtain additional in-patient treatment, otherwise defendant would "become homicidal eventually and possibly kill someone."

After hearing evidence in aggravation and mitigation, the trial court found defendant eligible for sentences of death or natural life in prison based on felony murder, or an extended-term sentence based upon a finding that defendant was exceptionally brutal. On June 30, 1987, the trial court sentenced defendant to an extended term of 50 years' imprisonment in the Illinois Department of Corrections. The court opined that while defendant may be a "throw-away kid, *** clearly he is an extremely dangerous one." The trial court also made the following statement:

> "The story of the defendant is a tragedy. The story of Andres Laapa, the victim is a tragedy. Having considered all the facts and circumstances in this case and the statutory criteria, the age of the defendant, his background, I cannot sentence the defendant to death. I do not think that would be an appropriate sentence nor do I think natural life without possibility of parole is an appropriate sentence. Nor can I sentence the defendant to the twenty-four years, which the defense asked for, to do so would be to deprecate the seriousness of the crime and the offense and the viciousness of the crime."

This appeal followed.

Defendant contends that his convictions must be reversed, and his cause remanded for a new trial because the trial court's instructions to the jury concerning murder and voluntary manslaughter were erroneous pursuant to *People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141. The State maintains that *Reddick* should not be applied to this case retroactively. In the alternative, if this court applies *Reddick* retroactively, the State argues that any error which resulted from the jury instructions was harmless beyond a reasonable doubt because the jury would have found defendant guilty even if it had been properly instructed.

In *Reddick*, the Illinois Supreme Court held that the then existing jury instructions for voluntary manslaughter (Illinois Pattern Jury Instructions, Criminal, Nos. 7.04 (voluntary manslaughter-provocation), 7.06 (voluntary manslaughter-belief of justification) (2d ed. 1981) (hereinafter IPI Criminal 2d)), when read in conjunction with the existing jury instruction for murder (IPI Criminal 2d No. 7.02), erroneously stated the burden of proof on the question of whether defendant was provoked and acted in intense passion or whether defendant was under an unreasonable belief that his action was justified. (*People v. Reddick* (1988), 123 Ill. 2d 184, 194-95, 526 N.E.2d 141, 145. See also *People v. Dower* (1991), 218 Ill. App. 3d 844, 848-49, 578 N.E.2d 1153, 1156-57; *People v. Sargent* (1990), 207 Ill. App. 3d 631, 635-36,

566 N.E.2d 318, 321-22; *People v. Moleterno* (1990), 199 Ill. App. 3d 15, 23-24, 556 N.E.2d 703, 708-09; *People v. Siverly* (1990), 194 Ill. App. 3d 981, 992-93, 551 N.E.2d 1040, 1047-48.) The *Reddick* court wrote:

> "The voluntary manslaughter instructions indicate that to obtain a voluntary manslaughter conviction the People must prove the existence of one of the alternative mitigating mental conditions which the People contend did not exist. By contrast, the murder instruction makes no mention of the mitigating mental conditions. These instructions essentially assure that, if the jury follows them, the jury cannot possibly convict a defendant of voluntary manslaughter. The reason is that even if a mitigating mental state is proved, it will have been proved by the defendant, not the People.
>
> * * *
>
> The burden-of-proof instructions regarding both voluntary manslaughter and murder * * * were thus incorrect in placing upon the People the burden of proving the existence of intense passion or unreasonable belief in justification. The instructions should have placed upon the People the burden of disproving the existence of either of these two states of mind." *Reddick*, 123 Ill. 2d at 194-95, 197, 526 N.E.2d at 145, 146.

See also *Sargent*, 207 Ill. App. 3d at 635, 566 N.E.2d at 321; *Siverly*, 194 Ill. App. 3d at 992-93, 551 N.E.2d at 1047-48.

Later, our supreme court ruled that *Reddick* does not apply retroactively to cases on collateral review. *People v. Flowers* (1990), 138 Ill. 2d 218, 237-42, 561 N.E.2d 674, 682-84. See also *People v. Green* (1991), 218 Ill. App. 3d 71, 77, 578 N.E.2d 169, 173; *People v. Sanders* (1991), 209 Ill. App. 3d 366, 377, 568 N.E.2d 200, 207; *People v. Mackey* (1990), 207 Ill. App. 3d 839, 863, 566 N.E.2d 449, 464; *People v. Rosa* (1990), 206 Ill. App. 3d 1074, 1082, 565 N.E.2d 221, 226.

Recently, however, our supreme court ruled that since the holding in *Reddick* is of constitutional dimension, the *Reddick* decision applies retroactively to all cases with appeals pending on direct review at the time *Reddick* was decided. *People v. Shields* (1991), 143 Ill. 2d 435, 444, 575 N.E.2d 538, 542-43. See also *Dower*, 218 Ill. App. 3d at 849, 578 N.E.2d at 1157.

A *Reddick* error, however, does not require the reversal of a defendant's convictions. (*Shields*, 143 Ill. 2d at 444, 575 N.E.2d at 543; *Dower*, 218 Ill. App. 3d at 849, 578 N.E.2d at 1157.) Despite the retroactive application of *Reddick*, this court has ruled on many occa-

sions that a defendant's conviction should not be reversed where the *Reddick* error was harmless beyond a reasonable doubt. See, *e.g.,* *Shields,* 143 Ill. 2d at 446-47, 575 N.E.2d at 543-45; *People v. Austin* (1989), 133 Ill. 2d 118, 123-24, 549 N.E.2d 331, 333; *People v. Harris* (1989), 132 Ill. 2d 366, 395, 547 N.E.2d 1241, 1254; *Dower,* 218 Ill. App. 3d at 850, 578 N.E.2d at 1157-58; *Rosa,* 206 Ill. App. 3d at 1082-83, 565 N.E.2d at 227; *People v. Riggins* (1990), 205 Ill. App. 3d 904, 913-14, 564 N.E.2d 122, 128; *People v. Williams* (1990), 205 Ill. App. 3d 751, 759-60, 563 N.E.2d 762, 767; *People v. Moleterno* (1990), 199 Ill. App. 3d 15, 23-24, 556 N.E.2d 703, 709; *People v. Siverly* (1990), 194 Ill. App. 3d 981, 993, 551 N.E.2d 1040, 1048; *People v. Daniel* (1989), 191 Ill. App. 3d 837, 847-48, 548 N.E.2d 354, 361-62; *People v. Beacham* (1989), 189 Ill. App. 3d 483, 488, 545 N.E.2d 392, 396; *People v. Carter* (1988), 177 Ill. App. 3d 593, 598-600, 532 N.E.2d 531, 535-36.

When determining whether a *Reddick* violation constituted harmless error or reversible error, a court of review must evaluate the impact of the jury instructions in the context of the entire record. (*Shields,* 143 Ill. 2d at 445-46, 575 N.E.2d at 543; *Dower,* 218 Ill. App. 3d at 849, 578 N.E.2d at 1157.) An appellate court may then conclude that the instructions tendered in violation of *Reddick* were harmless beyond a reasonable doubt and that the defendant is not entitled to a new trial because the result of the trial would not have been different even if the jury had been properly instructed. *Dower,* 218 Ill. App. 3d at 850, 578 N.E.2d at 1157; *Riggins,* 205 Ill. App. 3d at 913-14, 564 N.E.2d at 128; *Siverly,* 194 Ill. App. 3d at 993, 551 N.E.2d at 1048. See also *Chapman v. California* (1967), 386 U.S. 18, 24, 17 L. Ed. 2d 705, 710-11, 87 S. Ct. 824, 828 (errors of constitutional dimension may be deemed harmless by a court of review if said errors were harmless beyond a reasonable doubt).

■■ We find that *Reddick* should apply retroactively to the present case because defendant's case was pending on appeal at the time *Reddick* was decided. Upon applying *Reddick* to the present case, we also find that the trial court erred because it instructed the jury improperly concerning the State's burden of proof.

Upon viewing the entire record in the present case, however, we find that the trial court's error was harmless beyond a reasonable doubt. The evidence presented at trial was insufficient to support defendant's contention that he was justified in killing the victim. Defendant in his own written statement admits that he intervened in an altercation between Turner, who was the initial aggressor, and the victim. The victim, thereafter, attempted to escape but defendant and

Turner chased the victim and tripped him. Defendant and Jaime then began to beat and kick the victim. Next, Jaime beat the victim with a metal soda syrup canister. Defendant then stabbed the victim with a pocket knife. Ortiz' testimony was substantially the same. Based upon this evidence, it is apparent that defendant could not have been acting under an unreasonable belief of the defense of another. By defendant's own admission, he helped his codefendant fight the victim and he then chased the victim while the victim was trying to escape. Furthermore, defendant's use of a knife was excessive in light of the fact that the victim had already been injured when he fell and hit his head, and when he was struck by the soda canister. The evidence of defendant's guilt is so overwhelming, clear and convincing that the jury's verdict would not have been different had the proper instructions been given. Therefore, the trial court's submission of the "unreasonable belief" voluntary manslaughter instruction to the jury constituted harmless error beyond a reasonable doubt. Accordingly, a reversal of defendant's convictions and the remand of his cause are not warranted.

Next, defendant contends that his armed robbery conviction must be reversed because he was not proven guilty of the offense beyond a reasonable doubt. Defendant maintains that he was not proved guilty of armed robbery beyond a reasonable doubt because the State failed to establish that the acts he committed were motivated by anything other than his belief that he was defending his friend Turner, thus failing to establish proof of a common design to commit robbery which would render him accountable for the subsequent taking of the victim's money by a codefendant. The State maintains that defendant was proven guilty of armed robbery beyond a reasonable doubt because defendant aided and abetted his codefendant in the commission of said offense. We agree.

When faced with a challenge to the sufficiency of the evidence, it is not the function of an appellate court to retry a defendant. (*People v. Trimble* (1991), 220 Ill. App. 3d 338, 350, 580 N.E.2d 1209, 1216.) The relevant inquiry upon judicial review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis omitted.) (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; see also *Trimble*, 220 Ill. App. 3d at 350, 580 N.E.2d at 1216; *People v. Schorle* (1990), 206 Ill. App. 3d 748, 759, 565 N.E.2d 84, 91.) The determination of the credibility of witnesses and the weight to be accorded their testimony is a function reserved for the

trier of fact, and a court of review normally will not substitute its own judgment in that regard. (*People v. Locascio* (1985), 106 Ill. 2d 529, 537, 478 N.E.2d 1358, 1361; *Schorle*, 206 Ill. App. 3d at 758, 565 N.E.2d at 90.) " '[A] guilty verdict shall not be [reversed] on review unless it is inconclusive, improbable, unconvincing, or contrary to human experience.' " *Trimble*, 220 Ill. App. 3d at 350, 580 N.E.2d at 1216, quoting *Schorle*, 206 Ill. App. 3d at 758, 565 N.E.2d at 90.

A person commits armed robbery when he removes property from the person of another by the use of force while armed with a dangerous weapon located on or about his person. Ill. Rev. Stat. 1985, ch. 38, par. 18—2(a).

In addition, sections 5—1 and 5—2(c) of the Criminal Code of 1961 make the following provisions concerning guilt based upon accountability:

"§5—1. Accountability for Conduct of Another. A person is responsible for conduct which is an element of an offense if the conduct is either that of the person himself, or that of another and he is legally accountable for such conduct as provided in Section 5—2, or both.

§5—2. When Accountability Exists. A person is legally accountable for the conduct of another when:

\* \* \*

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense. However, a person is not so accountable, unless the statute defining the offense provides otherwise, if:

(1) He is a victim of the offense committed; or

(2) The offense is so defined that his conduct was inevitably incident to its commission; or

(3) Before the commission of the offense, he terminates his effort to promote or facilitate such commission, and does one of the following: wholly deprives his prior efforts of effectiveness in such commission, or gives timely warning to the proper law enforcement authorities, or otherwise makes proper effort to prevent the commission of the offense." (Ill. Rev. Stat. 1985, ch. 38, pars. 5—1, 5—2(c).)

A defendant's intent to promote or facilitate the commission of a crime may be demonstrated by evidence that the defendant shared the criminal intent of the principal or by evidence that there was a community of unlawful purpose. (*People v. Reed* (1982), 104 Ill. App.

3d 331, 338, 432 N.E.2d 979, 984.) The latter is proved by evidence of the defendant's prior deliberation to commit the offense or by the spontaneous and combined participation of a group in the perpetration of the crime. (*Reed*, 104 Ill. App. 3d at 338, 432 N.E.2d at 984-85.) If the evidence shows that the defendant was present at the scene of the crime and failed to disapprove of or oppose the crime, or if the defendant failed to report the offense, said conduct may be considered by the trier of fact in concluding that the defendant lent his countenance and approval to the crime, and aided and abetted in the commission of the crime. *Reed*, 104 Ill. App. 3d at 338, 432 N.E.2d at 985.

 Upon viewing the evidence in the light most favorable to the prosecution, we find that the jury's verdict is neither inconclusive, improbable, unconvincing, nor contrary to human experience. Any rational jury could have found that defendant was accountable for the commission of the essential elements of armed robbery beyond a reasonable doubt. Defendant was found guilty of armed robbery under a theory of accountability based on acts committed either in whole or in substantial part by his codefendants. In the present case, defendant did not commit the overt act of removing money from the victim's body. The record, however, clearly shows that defendant lent his countenance and approval to the robbery, failed to report the crime to the police and thereby aided and abetted his codefendant in robbing the victim. Defendant and his codefendants Turner and Jaime fought with the victim. The victim attempted to escape but was detained. Defendant stabbed the victim three times with a knife. After the victim was stabbed, Jaime, who had hit the victim with a soda canister earlier, removed money from the victim's person. Defendant witnessed this robbery and later shared in the proceeds of the robbery. Defendant also failed to report the killing or the robbery of the victim to the police. Accordingly, defendant is not exempt from guilt based upon accountability and we will not disturb the jury's verdict.

The present case is analogous to *People v. Reed* (1982), 104 Ill. App. 3d 331, 432 N.E.2d 979. The defendant in *Reed* also contended that he was not proven guilty of armed robbery based upon a theory of accountability. The court, in discounting this argument, wrote:

"We believe the defendant aided and abetted in Truitt's murder because he was present at the scene of the crime, having remained outside her apartment [citation], and did not oppose or disapprove of Hall's actions. Although he was free to do so, the defendant did not leave the area or seek aid from others [citation], and instead waited for Hall to return. Reed also lent his

countenance to Hall's actions by asking her for some of the jewelry taken from Truitt's apartment. He did not report the incident to the authorities.

\* \* \*

For the reasons we determined that the defendant was proved accountable for Truitt's murder, we also hold that he was proved accountable for the armed robbery." *Reed*, 104 Ill. App. 3d at 338-39, 432 N.E.2d at 985.

In addition, we would like to address defendant's argument that he was not proven accountable for armed robbery beyond a reasonable doubt on the basis of Ortiz' testimony and *People v. Brumbeloe* (1968), 97 Ill. App. 2d 370, 240 N.E.2d 150, where this court held that the defendant was not accountable for the crime committed by his codefendant. First, we are not persuaded by defendant's argument that he was not proven accountable for armed robbery beyond a reasonable doubt because Ortiz' testimony was "thoroughly impeached" and therefore unreliable. While there were some inconsistencies between Ortiz' testimony before the grand jury and Ortiz' testimony at trial, these inconsistencies concerned acts performed by Turner and Jaime, and not defendant. Ortiz' testimony concerning defendant's actions were the same at both the pretrial hearing and the trial. It cannot be said, therefore, that her testimony with regard to defendant was impeached in any way.

Second, the *Brumbeloe* case upon which defendant relies is factually distinguishable from the present case. In *Brumbeloe*, the victim assaulted the defendant twice and threatened the defendant's life prior to the date the victim was killed. On the day the victim was killed, the defendant, who was armed with a knife, was walking down the street with some friends. The victim, who had his hand in his pocket, ran towards the defendant. As the defendant fought with the victim in order to protect himself, the defendant's knife fell to the ground. The defendant's friend and codefendant then picked up the knife and stabbed the victim. (*Brumbeloe*, 97 Ill. App. 2d at 376-77, 240 N.E.2d at 154.) The court ruled that the defendant could not be held accountable for stabbing the victim. (*Brumbeloe*, 97 Ill. App. 2d at 378, 240 N.E.2d at 154-55.) In the present case, the facts are different. Defendant stabbed a victim who was attempting to escape from a fight after one of defendant's friends initiated the altercation. Accordingly, we find that defendant was proven guilty of armed robbery beyond a reasonable doubt.

Finally, defendant contends that the trial court abused its discretion when it sentenced him to an extended term of 50 years' impris-

onment. First, defendant maintains that the trial court was improperly influenced by the judge's belief that defendant was mentally ill and "extremely dangerous." The defense contends that evidence of defendant's mental illness was introduced in order to establish the statutory mitigating factor of extreme mental or emotional disturbance. (See Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(c)(2), 1005—5—3.1(4).) Defendant maintains that the trial court's reliance in aggravation upon a factor which is statutorily defined as a mitigating factor was an abuse of discretion. Second, defendant maintains that his extended-term sentence was improper because his behavior was not exceptionally brutal or heinous. Defendant prays that this court vacate his sentence and remand this cause for resentencing, or in the alternative, reduce his sentence pursuant to Illinois Supreme Court Rule 615(b)(4). 134 Ill. 2d R. 615(b)(4).

The State maintains that defendant has waived the right to judicial review of his sentence because he failed to object during the sentencing hearing and in his post-trial motion. In the alternative, if we choose to review this issue, the State argues that the trial court's sentence was proper because defendant's crime was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.

In response to the State's argument that the doctrine of waiver applies, defendant maintains that waiver should not be invoked by this court because the record shows that he vigorously contested the State's request for an extended-term sentence and because the trial court heard both testimony and argument against the imposition of an extended-term sentence. We agree.

■■ As a general rule, a defendant's failure to object to an alleged error during a sentencing hearing and in his post-trial motion renders the issue waived for purposes of appellate review. (*People v. Sperow* (1988), 170 Ill. App. 3d 800, 811, 525 N.E.2d 223, 230.) Illinois Supreme Court Rule 615, however, makes the following provisions:

> "(b) Powers of the Reviewing Court. On appeal, the reviewing court may:
> * * *
>
> (2) set aside, affirm, or modify any or all of the proceedings subsequent to or dependent upon the judgment or order from which the appeal is taken;
> * * *
>
> (4) reduce the punishment imposed by the trial court." (134 Ill. 2d Rules 615 (b)(2), (b)(4).)

Accordingly, we will review the issue of the trial court's alleged error of imposing an extended-term sentence upon defendant pursuant to

the power granted us in Illinois Supreme Court Rules 615(b)(2) and (b)(4).

It is well settled that the imposition of a sentence is a matter involving considerable judicial discretion. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 492, 431 N.E.2d 344, 348.) The trial judge's discretion with respect to the imposition of a sentence may be exercised within the range of the minimum and maximum time limits set by the legislature. (*People v. Hart* (1971), 132 Ill. App. 2d 558, 563, 270 N.E.2d 102, 105.) "The trial judge's determination of an appropriate sentence must be given great deference and weight, because the trial judge is in the best position to make a sound determination regarding punishment." (*People v. Trimble* (1991), 220 Ill. App. 3d 338, 355, 580 N.E.2d 1209, 1220; see also *People v. Cabrera* (1987), 116 Ill. 2d 474, 494, 508 N.E.2d 708, 716.) The imposition of an extended-term sentence will only be reversed upon a finding that the trial court abused its discretion. *People v. Thomas* (1988), 168 Ill. App. 3d 113, 118, 522 N.E.2d 253, 256; see also *Cabrera*, 116 Ill. 2d at 494, 508 N.E.2d at 716.

We find that the trial court properly concluded that defendant's conduct was exceptionally brutal and heinous, indicative of wanton cruelty. Section 5—5—3.2 of the Unified Code of Corrections permits the trial court to sentence a defendant who is convicted of a felony to an extended term of 40 to 80 years imprisonment if the offense was accompanied by the aggravating factors of exceptionally brutal or heinous behavior indicative of wanton cruelty. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2 (b)(2); see also *People v. D'Aquila* (1991), 220 Ill. App. 3d 905, 909, 581 N.E.2d 336, 339.) A showing that the defendant inflicted unnecessary pain or torture upon the victim is not a prerequisite to a finding that the defendant's behavior was brutal or heinous. (*La Pointe*, 88 Ill. 2d at 501, 431 N.E.2d at 353; *People v. Barfield* (1989), 187 Ill. App. 3d 190, 202, 543 N.E.2d 812, 819.) "Conduct is 'heinous' if it is hatefully or shockingly evil, grossly bad, enormously and flagrantly criminal. [Citations.] 'Brutal' includes conduct which is grossly ruthless, devoid of mercy or compassion, or cruel and cold-blooded." *Barfield*, 187 Ill. App. 3d at 202, 543 N.E.2d at 819; see also *La Pointe*, 88 Ill. 2d at 501, 431 N.E.2d at 353; *People v. Clay* (1984), 124 Ill. App. 3d 140, 155, 463 N.E.2d 929, 940-41.

In the present case, defendant and his two codefendants beat the victim. Defendant then stabbed the victim three times with a knife. Defendant and one of his codefendants then dragged the bleeding victim across the parking lot, over a guard rail and through an alley and left the victim in another parking lot in order to conceal his body. Defendant's conduct was brutal as it was devoid of mercy. We are not per-

suaded by defendant's assertion that his conduct was not exceptionally brutal or heinous and indicative of wanton cruelty because the victim's stab wounds were not the primary cause of his death. "[A]pplication of the extended-term statute is determined by the 'offense' rather than by the extent or nature of the defendant's participation. *** Therefore, in deciding whether to impose an extended-term sentence, the court is to look at the offense itself." (*Thomas*, 168 Ill. App. 3d at 122, 522 N.E.2d at 259.) "A single act which causes death or injury may be sufficient to demonstrate the existence of wanton cruelty." (*Barfield*, 187 Ill. App. 3d at 202, 543 N.E.2d at 819; see also *La Pointe*, 88 Ill. 2d at 501, 431 N.E.2d at 353; *Clay*, 124 Ill. App. 3d at 155, 463 N.E.2d at 940-41.) The fact that a defendant is convicted under a theory of accountability or that his participation in the crime was less than that of his codefendant does not preclude the imposition of an extended-term sentence upon him. *Clay*, 124 Ill. App. 3d at 153, 463 N.E.2d at 940.

■ In addition, we find that the trial court properly relied upon evidence of defendant's mental illness. There is a strong presumption that the sentencing court has considered all evidence of mitigation brought before it. (*People v. Trimble* (1991), 220 Ill. App. 3d 338, 355-56, 580 N.E.2d 1209, 1220; *People v. Whitehead* (1988), 171 Ill. App. 3d 900, 908, 525 N.E.2d 1084, 1089.) Defendant has failed to overcome this presumption. The record shows that the trial court considered defendant's background as a mitigating factor and decided not to impose a death sentence or a sentence of natural life in prison without possibility of parole upon defendant.

In summary, defendant has failed to demonstrate that the trial court abused its discretion when it sentenced him to an extended term of 50 years' imprisonment. The trial court heard the testimony of several witnesses including defendant. The trial court also heard and considered evidence in aggravation and mitigation during defendant's sentencing hearing. The record shows that the trial court carefully considered all of the evidence, the nature of the offense, defendant's background, and the seriousness of defendant's crime. In addition, defendant's sentence was well within the range of years prescribed by the Uniform Code of Corrections. Accordingly, we affirm the trial court's extended-term sentence of 50 years upon defendant.

For the aforementioned reasons, we affirm the judgment of the circuit court.

Affirmed.

TULLY and CERDA, JJ., concur.