NOTICE
Decision filed 01/13/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 230163-U

NO. 5-23-0163

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Wabash County. |
| | ) | |
| v. | ) | No. 20-CF-5 |
| | ) | |
| RUBEN A. CORZINE, | ) | Honorable |
| | ) | Michael J. Valentine, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BOLLINGER* delivered the judgment of the court.
Justices Boie and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm defendant's sentence, as the circuit court properly considered mitigating factors, appropriately assessed statutory aggravating factors, defense counsel did not render ineffective assistance, and the claim of double enhancement was waived. Even if defendant had not waived the double enhancement issue on appeal, no plain error occurred.

¶ 2    Defendant, Ruben A. Corzine, entered a plea of guilty to first degree murder and was subsequently sentenced to a prison term of 50 years in the Illinois Department of Corrections. On appeal, defendant contends that the circuit court failed to consider certain mitigating factors and improperly considered some statutory aggravating factors. Furthermore, defendant argues that the circuit court, during the sentencing process, considered an element inherent in the offense of first

_____

*Justice Welch was originally assigned to the panel before his death. Justice Bollinger was later substituted on the panel and has listened to oral arguments and read the briefs.

1

degree murder. Additionally, he asserts that his defense counsel was ineffective for neglecting to object to this consideration and for failing to raise this issue in a postsentencing motion. For the reasons outlined herein, we affirm the sentence imposed by the circuit court.

¶ 3                                    I. BACKGROUND

¶ 4      On January 30, 2020, defendant was charged with first degree murder pursuant to section 9-1(a)(1) of the Criminal Code of 2012 (720 ILCS 5/9-1(a)(1) (West 2018)). The information alleged that without lawful justification and with the intent to kill, defendant stabbed Jennifer L. Phelps with a knife, thereby causing her death.

¶ 5      On February 13, 2020, defense counsel submitted an amended motion for fitness, asserting generally that defendant had previously been diagnosed with "mental illnesses." It further claimed that defendant had previously been sentenced to the Illinois Department of Corrections (IDOC) for incidents related to his mental health. The petition stated that defendant had not been taking his prescribed medication, and immediately prior to the current incident, he was taken to Wabash General Hospital for concerns regarding his mental health. The amended motion also noted that defendant informed defense counsel of a suicide attempt while detained at the Wabash County jail. The motion was granted on the same day.

¶ 6      A fitness evaluation prepared by Dr. Victoria Codispoti was submitted on May 31, 2020. The record on appeal includes only the final page of Dr. Codispoti's report, which included her findings. She concluded, within a reasonable degree of psychiatric certainty, that defendant was fit to stand trial.

¶ 7      On June 11, 2020, defendant requested a second fitness evaluation and the State did not object. On July 21, 2020, Dr. Daniel Cuneo was appointed to evaluate defendant.

¶ 8    A letter from Dr. Cuneo detailing his evaluation of defendant was filed on August 24, 2020. The correspondence indicated that he inquired of defendant concerning the charges against him, and the following was defendant's response:

"First Degree Murder. Killed my fiancée. I never denied doing it. I don't understand why. They keep saying I had to go to the hospital. I went to the hospital. I hearing voices and I going to a friend's house. Crashed and police officer let me go and I went to a friend's house. They took me to a hospital. I got scared and took off. Officer let me go. I still hearing voices. There was a plot to kill me. I made it to the house. She (his fiancée) glad I made it to the house. I still hearing stuff. Hear my name being called. I went back to the house again. Fiancée telling me I had to go to work. I still hearing things. I took a knife and went to the basement. I couldn't get the light to come on. Went back upstairs. I wanted to leave. I going to take off again. When I trying to leave, she saw the knife in my back pocket. She grabbed the knife and I kinda blacked out. I been up for two days."

¶ 9    Dr. Cuneo stated that he reviewed the charging documents, police reports, statements, discovery materials, records from the Wabash County Health Department, criminal history, Dr. Codispoti's fitness evaluation dated May 31, 2020, and correspondence from defendant's counselor. He determined that defendant was oriented to person, time, and place. Dr. Cuneo's report indicated that defendant admitted experiencing auditory and visual hallucinations. The report also noted that defendant was delusional and believed that others were attempting to harm him. Furthermore, the report stated that defendant informed Dr. Cuneo that he had dropped out of high school due to his placement in a disciplinary school for fighting.

¶ 10    Dr. Cuneo observed that defendant's long- and short-term memory functions were intact and that defendant acknowledged experiencing feelings of depression and anxiety. Defendant

informed Dr. Cuneo that he had attempted suicide on two occasions since he killed Phelps, both instances occurred while he was incarcerated at the Wabash County jail. He further stated that he began drinking alcohol at approximately 10 or 11 years of age, though he asserted that his last intake was one week prior to his incarceration. Defendant disclosed his history of substance abuse, including methamphetamine, opiates, and cocaine use, with the most recent use of opiates occurring two weeks prior to incarceration, and the last use of cocaine approximately 10 years ago. The report indicated that defendant denied receiving any mental health treatment; however, defendant noted that he was diagnosed with schizophrenia during his last imprisonment, but he did not pursue any treatment for the condition. Dr. Cuneo's belief was that defendant's mental illness did not substantially impair his ability to understand the nature and purpose of the proceedings against him or his ability to assist in his own defense.

¶ 11 An agreed order was issued on September 10, 2020, wherein both defendant and the State agreed defendant was fit to stand trial. The order noted that (1) on May 31, 2020, Dr. Codispoti submitted a fitness evaluation indicating, within a reasonable degree of medical certainty, that defendant was fit to stand trial; (2) defendant requested, and the State did not object, that Dr. Cuneo conduct an evaluation regarding defendant's fitness to stand trial; and (3) on August 20, 2020, Dr. Cuneo provided a report to the court affirming, within a reasonable degree of medical certainty, that defendant was fit to stand trial.

¶ 12 On October 8, 2020, defendant filed a motion for a mental illness evaluation. He reiterated that he suffered from severe mental illnesses that had previously gone undiagnosed but persisted. He requested that Dr. Cuneo conduct the evaluation so that defendant can be "diagnosed and evaluated for a mental illness." The State expressed no opposition to the motion, and it was granted the same day.

4

¶ 13    On January 21, 2021, Dr. Cuneo submitted an additional letter. In this correspondence, Dr. Cuneo inquired of defendant regarding the offense, to which defendant responded:

"I worked that day doing a remodel job. I was hearing voices that day. I hearing my name - Ruben, Ruben. At about 1:00 - 2:00 p.m. I hearing voices saying she was leaving (Jennifer). I went home and she was sleeping. I went back to the job site. Then I don't remember much till dark. I cooked two New York strips for her and me. I couldn't sleep because I heard voices saying she was against me and she was going to Arkansas. Her son took me to the hospital. I still not getting any rest. We both told the doctors on January 28 that I couldn't get any sleep and the doctor told me to just take Ibuprofen. We (Jennifer and he) were not arguing about anything. I had already left once. I heard voices in the basement. I put the knife in my back pocket. I came to and I had blood on the knife. I was over the top of her when I came to. I could never hurt anyone. It was just me and her against the world. I just remember me having blood on me."

¶ 14    Dr. Cuneo's letter noted that, in his video-recorded statement to the police, defendant indicated that he and Phelps were arguing at the time of the offense, subsequently describing the stabbing. Dr. Cuneo inquired about this, to which defendant replied that he did not understand why he would have informed the police that he was arguing with Phelps. Furthermore, Dr. Cuneo stated that, although defendant repeatedly asserted that he was hallucinating at the time of the incident, he never disclosed these hallucinations to the police. Instead, he merely stated "that they were arguing and Jennifer 'pushed' his buttons." Dr. Cuneo also observed that defendant told the police he had grabbed the kitchen knife and that they "got into it," and he claimed to have blacked out during the attack.

5

¶ 15    Dr. Cuneo opined that defendant was suffering from a substantial disorder of thought, mood, and behavior which "afflicted him at the time of the alleged offense which impaired his judgment and negatively affected his behavior, but not to the extent that he was unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." Dr. Cuneo further stated that defendant's accounts of hallucinations at the time of the offenses were "extremely suspect." Dr. Cuneo concluded:

"While Mr. Corzine denied taking any type of drugs at the time of the alleged offense to me, in his videotaped statement he spoke of how he was using methamphetamine and opioids at that time. While these drugs may very well have increased his paranoia, further impaired his judgment, decreased his already poor impulse control, and greatly increased his potential for acting out; *** these drugs were taken willingly. He is not intellectually limited and knows that stabbing an individual can cause death. Therefore, it would be my opinion that Mr. Ruben Corzine was legally sane at the time of the alleged offense.

It would also be my opinion that Mr. Corzine's mental illness did play a substantial role in his actions. He does have a personality disorder and has many symptoms consistent with Unspecified Schizophrenia Spectrum and Other Psychotic Disorders. He has repeatedly self medicated with drugs and alcohol as a means of dealing with his mental health problems. These drugs clearly increased his potential for acting out. His mental illness played a major role in his actions at the time of the alleged offense. Therefore, it would be my opinion that Mr. Ruben Corzine would qualify for a Guilty But Mentally Ill Plea."

6

¶ 16    On July 15, 2021, defendant entered a plea of guilty and waived his right to a jury trial. On September 1, 2021, probation officer Judy Lewis submitted a presentence report. It outlined defendant's family background, educational history, and physical health status. The report also provided a detailed discussion of Dr. Codispoti's report and Dr. Cuneo's report and correspondence. Defendant informed Lewis that he had been prescribed medication for the past year; however, despite Lewis's request, no records of such medication were provided to her.

¶ 17    The report expounded upon defendant's criminal history. In 2007 defendant was convicted of failure to identify a fugitive from justice. In 2012, defendant was charged with a DUI and careless driving and was placed on supervision. A petition to revoke supervision was filed, and he was placed on another year of supervision. In 2016, he was convicted *ex parte* of the crimes of possession of drug paraphernalia and possession of cannabis. Additionally, in 2016, defendant was sentenced to two years of probation following a conviction for possession of a controlled substance. In 2017, defendant received a two-year sentence in IDOC for the crimes of possession of weapons by a felon and reckless discharge of a firearm. Lastly, in 2019, defendant was placed on one year of court supervision for the improper use of a vehicle title. Defendant also had an order of protection issued against him in 2011.

¶ 18    Lewis observed that the discharge instructions dated January 28, 2020, from Wabash General Hospital indicated that defendant was assessed for atypical chest pain and idiopathic insomnia. It was advised that defendant refrain from stimulants, and additional evaluations were deemed necessary.

¶ 19    A sentencing hearing was held on September 10, 2021. The State observed that the hearing served two purposes: (1) a sentencing hearing, and (2) a hearing regarding defendant's mental condition to assist the circuit court in evaluating the guilty but mentally ill request.[1]

¶ 20    Mary Sweppy testified first on behalf of the State. She was a 911 dispatcher in Mt. Carmel and was performing her duties on January 29, 2020. The sheriff's department and the police department share a lobby, so her work area is accessible to individuals entering that lobby. On that date, she came into contact with Teena Perry, who was highly distressed. Perry entered hurriedly with her cellphone in hand and displayed it to Sweppy. Perry informed Sweppy that her friend told her he stabbed his girlfriend, and that she did not know the address. As she inquired about Perry's name, she received a 911 call from defendant. A recording of this call was played.[2]

¶ 21    Sergeant Kyle Adams of the Mt. Carmel Police Department testified next. He served as sergeant for over four years at the time of his testimony. On January 29, 2020, during the day shift, Sweppy dispatched him to 909 North Cherry Street. He was informed that an individual called and reported that he had stabbed his girlfriend. Sergeant Adams was dispatched at 8:39 a.m. and arrived at the residence at 8:41 a.m. Upon arrival, he encountered defendant at the rear door of the residence. Defendant had blood on his sleeves, shirt, pants, and boots. Defendant appeared calm and did not communicate much with Sergeant Adams. He was detained and handcuffed.

¶ 22    Subsequently, Sergeant Adams entered the residence and located Phelps in the northeast bedroom. She was lying face down beyond the bedroom door, which prevented the door from opening fully. Phelps had multiple cuts along her back, arms, face, and hands, and was covered in blood; the carpet and walls around her were also bloodstained. Sergeant Adams attempted to elicit

---

[1]We note this is the first time in the record that a guilty but mentally ill request is mentioned by either party.
    [2]The 911 call recording was not included as part of the record on appeal.

a response from Phelps by calling to her and shaking her, but there was no response. He placed his hands on her body and observed that she was becoming cold and stiff, indicating no signs of life. A knife was observed between Phelps's legs on the floor; it was covered in blood and appeared to be bent. A checkered jacket was seen on Phelps's back, which had been used to apply pressure to her wounds. Throughout this observation, defendant remained in the residence, silent and calm. Medical professionals arrived and confirmed Phelps's death. The coroner's office and the Illinois State Police Forensic Services Unit also arrived to process the scene, including photographing it. The photographs were admitted as evidence and depicted the room and Phelps as they appeared at the scene.

¶ 23    Following his departure from the residence, Sergeant Adams obtained surveillance footage from the date of the incident from the Wagon Wheel Liquor Store, which was two blocks west of the residence. This action was taken in response to information indicating that defendant had exited the residence prior to the emergency call to 911. Sergeant Adams testified that he reviewed the footage and observed defendant walking to the establishment, pacing, smoking a cigarette, making a telephone call, and subsequently returning in the direction of the residence. Defendant was recorded entering the footage at 8:08 a.m. and leaving at 8:15 a.m.

¶ 24    Shaun Keepes, the Coroner of Wabash County, testified next. He served as the coroner on January 29, 2020, and a representative from his office was dispatched to 909 North Cherry Street to verify the death of Phelps. The body was then transported to the coroner's office, where Dr. James Jacobi conducted an autopsy. Photographic documentation of the autopsy was submitted as exhibits. The autopsy diagram indicated that Phelps suffered from 37 stab wounds, 17 of which were on her face.

¶ 25    Victim impact statements were presented by Phelps's sisters, niece, and mother. They articulated how their lives have been profoundly affected and diminished by the loss of Phelps, and they expressed that defendant ought to be incarcerated for the remainder of his life.

¶ 26    Chief Michael McWilliams, the chief of police, testified for defendant. On the morning in question, the grandmother of defendant's son, Teena Perry, received a telephone call from defendant. Subsequently, Chief McWilliams spoke with Perry later that day, during which she informed him that defendant had contacted her to inform her of the incident involving Phelps. She proceeded to the police station at the same time defendant placed a 911 call. Perry informed Chief McWilliams that defendant had a history of making irrational remarks.

¶ 27    Chief McWilliams was aware of a prior arrest of defendant in 2017, when he was apprehended with a firearm. During that incident, defendant discharged shots towards the walls while inside a house. Defendant's children were present in the home during this shooting. Prior to that event, defendant had been awake, unable to sleep for several days, and had been hearing voices. At that time, Phelps transported defendant to the Wabash General Hospital emergency room to seek assistance.

¶ 28    On the same day of Phelps's death, Phelps took defendant to the emergency room due to concerns regarding his mental health. Several hours later, this incident transpired. Chief McWilliams's report documented a video and an audiotaped statement of defendant; additionally, the report noted that at the conclusion of the statement, defendant expressed love for Phelps and remorse for the incident. Chief McWilliams testified that defendant appeared very "plain" and "very flat."

¶ 29    Chief McWilliams conducted interviews with Bryson Phelps and Dayton Brimm, two of Phelps's sons. They stated that Phelps took defendant to the emergency room two days prior due

to hearing voices and experiencing insomnia. Chief McWilliams stated that his report documented an argument between defendant and Phelps, noting that both boys overheard the argument and commented that such disagreements were unusual, as they typically did not argue. Furthermore, Chief McWilliams testified that Brimm mentioned that defendant's behavior was abnormal. Both boys left shortly before the incident. Chief McWilliams further testified that, when he interviewed defendant, defendant acknowledged having been involved in an argument with Phelps on that morning. He also indicated that on January 28, Phelps made two attempts to persuade defendant to visit the hospital.

¶ 30    Chief McWilliams testified that he interviewed Dustin Kieffer, who was defendant's best friend. Kieffer informed Chief McWilliams that defendant was not under the influence of any substances. He stated that, in the days prior, he and defendant had been working together, and that defendant was experiencing auditory hallucinations again, which were typically indicative of substance abuse by defendant. Kieffer further stated that he inquired of defendant regarding drug use, given defendant's history of consumption and the typical auditory hallucinations experienced during such activity. Defendant, however, firmly denied any such use. Kieffer noted that, generally, if defendant were using drugs, he would be honest and admit to it. Finally, Kieffer expressed concern that defendant's behavior was abnormal and that he had reservations regarding his driving.

¶ 31    Judy Lewis testified next. She served as a probation officer for Wabash County and was responsible for preparing the presentence report. She indicated that defendant did not complete high school and was employed in the construction and roofing industries. He also conveyed to her that he was engaged in a construction-related occupation at the time of his arrest.

¶ 32    Lewis testified that defendant was incarcerated in 2017 for a period of two years. Additionally, he received a sentence of probation related to a first offender substance abuse case in 2016. She served as his probation officer during that period and testified that his conduct was satisfactory.

¶ 33    Lewis stated that defendant informed her that he had resided with Phelps for approximately one and a half years and that they had known each other for many years. Defendant conveyed to Lewis that he suffered from cancer in his jaw in the past and was currently in remission. She testified that when defendant spoke to her, he appeared to be open, honest, and as helpful as possible. She noted that his demeanor was somewhat flat. She was unaware whether he was taking any medications. Additionally, she testified that her report indicated that defendant was seeing a physician at the Egyptian Health Department but she was unaware that he was receiving a monthly injection for his medication.

¶ 34    Lewis testified that defendant did not discuss hearing voices extensively with her. Lewis stated that she reviewed medical reports concerning defendant's mental health evaluations and was aware that these reports indicated that defendant was fit to stand trial. She further testified that during her conversations with defendant, he understood her questions and was able to provide appropriate responses. She testified that at no point did he become agitated to an extent that would impair his ability to understand or respond.

¶ 35    The initial report she reviewed was authored by Dr. Cuneo, who stated that he had received reports indicating that defendant had been hearing voices since 2017. Dr. Cuneo diagnosed defendant with a schizophrenia-type disorder. The second evaluation was also conducted by Dr. Cuneo, who opined that defendant exhibited a substantial disorder affecting thought, mood, and behavior. He stated that defendant qualified for a verdict of guilty but mentally ill.

12

¶ 36    Lewis testified that she received a one-page report from the January 28 Wabash General Hospital visit. The report she reviewed stated that defendant was being evaluated for chest pains and insomnia, but she testified that if the emergency room report indicated that defendant stated he had been hearing voices and experiencing dreams and visions, she would not dispute those records. Lewis did not receive the report indicating that defendant tested negative for all illegal substances. Defendant was discharged from the hospital on January 28.

¶ 37    Lewis did not receive a report concerning defendant's emergency room visit on January 29, 2020. She was unaware that defendant returned to the emergency room at 4:01 a.m. Lewis was provided with the report while testifying, which indicated that another toxicology test was performed and showed that defendant tested negative for all illegal substances. The two emergency room reports were subsequently appended to the presentence report without any objection from the State.

¶ 38    The second clinical report from January 29, 2020, stated upon discharge:

"Condition at departure: stable. The patient left prior to discharge education being provided. The patient left the Emergency Department against medical advice and without completion of treatment; patient was unaccompanied. The patient appears to be alert, oriented x4, coherent and in no acute distress. The patient stated is leaving due to personal reasons. Notified of patient departure. Prior to leaving, he was advised to stay for completion of treatment. He was informed of the risks of leaving and verbalized understanding of these risks. Patient signed form prior to leaving. He left the Emergency Department ambulatory and via private vehicle. (pt came to nurse's station and voiced he was going to go ahead and head out. encouraged pt to stay as exam results were pending. pt turned around headed back into room put coat on and said he was 'just going to leave.'

13

Dr. Israelsen and this RN informed of risk 'delay of treatment' and to not take unknown substances)."

¶ 39    During cross-examination, Lewis stated that the 2021 report authored by Dr. Cuneo indicated that defendant informed him of having used methamphetamine fewer than 30 times since relocating to Illinois 10 years prior. Conversely, in her report, defendant reported that he had used methamphetamine on a few occasions. Lewis acknowledged that she regarded this as a discrepancy.

¶ 40    Defendant indicated that he did not wish to testify and did not wish to make a statement in allocution. This concluded defendant's evidence. During closing arguments, the State requested that defendant be sentenced to 60 years of incarceration. Defendant did not propose a specific sentence but requested that the circuit court consider the guilty but mentally ill plea.

¶ 41    The circuit court indicated that under section 5-4-1 of the Unified Code of Corrections (730 ILCS 5/5-4-1 (West 2018)), it was to consider the evidence received at trial, but noted that no trial occurred, and that defendant pleaded guilty. The circuit court indicated that it reviewed and considered the autopsy report, the exhibits, the hospital reports, and the cases cited by the State during closing arguments. The circuit court indicated that it considered the presentence report and the financial impact of incarceration. It stated that it was to consider the evidence offered by the parties in aggravation and mitigation, and found no factors in mitigation.

¶ 42    The circuit court then reviewed the factors in aggravation pursuant to section 5-5-3.2 of the Unified Code of Corrections (*id.* § 5-5-3.2). The circuit court stated, "the Court finds, number one, that the defendant's conduct caused the death of Jennifer Phelps. Thirty-seven stab wounds resulted in her death." The circuit court discussed the third statutory factor in aggravation, defendant's criminal history. It included a minor ordinance violation, a possession of a controlled

14

substance in which defendant successfully completed probation, and possession of a weapon by a felon and reckless discharge of a firearm for which he received two years in IDOC.

¶ 43 The circuit court reviewed the seventh statutory factor in aggravation and acknowledged that a sentence is essential to deter others from committing the same offense. The circuit court indicated that it considered arguments regarding sentencing alternatives and noted that defendant elected not to make a statement on his own behalf. The circuit court stated that it considered the victim impact statements that were read and filed.

¶ 44 The circuit court determined that defendant was guilty but mentally ill, as he visited Wabash General Hospital on January 28, 2020. The circuit court stated that defendant informed authorities of hearing voices and experiencing dreams and visions. Additionally, the circuit court observed that no drugs were present in defendant's system.

¶ 45 The circuit court discussed the early morning hospital visit on January 29, 2020, and reaffirmed that no drugs were found in defendant's system during that time. The circuit court noted that Dr. Codispoti's report dated May 31, 2020, indicated that defendant denied any history of psychiatric treatment, psychiatric hospitalization, or suicide attempts. However, defendant admitted to experiencing episodes of auditory hallucinations in the past while using drugs and alcohol. The report further stated that defendant reported hearing thoughts that he could not suppress, which advised him not to trust anyone and suggested that someone would be killed and someone would receive money from the situation. The circuit court additionally observed that Dr. Codispoti concluded that defendant was fit to stand trial.

¶ 46 The circuit court discussed the fitness examination report submitted by Dr. Cuneo on July 21, 2020, and acknowledged that Dr. Cuneo found defendant fit to stand trial. Furthermore, the circuit court stated that "[a]nd at that time it was his opinion that mental illness does not, at present,

15

substantially impair his ability to understand the nature and purpose of the proceedings against him or his ability to assist in his defense. And it was his opinion that Mr. Ruben Corzine was fit to stand trial."

¶ 47   The circuit court noted that a motion for evaluation of mental illness was filed, which resulted in Dr. Cuneo filing another report on January 18, 2021, noting:

> "At that time it was his opinion that Mr. Corzine's mental illness did not substantially impair either his ability to understand the nature and purpose of the proceedings against him or his ability to assist in his defense. He noted that he never mentioned hallucinations when he recanted his incident to the police.

> Dr. Cuneo stated in his opinion that Mr. Corzine was suffering from a substantial disorder of thought, mood and behavior, rule out unspecified schizophrenia spectrum, other psychotic disorders, alcohol use disorder, opioid use disorder, methamphetamine use disorder, cocaine use disorder and unspecified personality disorder which afflicted him at the time of the alleged offense, which impaired his judgment and negatively affected his behavior, but not to the extent that he was unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law."

¶ 48   The circuit court acknowledged that Dr. Cuneo observed that defendant's account of hallucinations during the time of the offense appeared suspect and Dr. Cuneo "concluded that he was sane at the time of the alleged offense." The circuit court further noted that Dr. Cuneo opined that defendant's mental illness played a substantial role in his actions. The circuit court stated:

> "He has a personality disorder and has many symptoms consistent with unspecified schizophrenia spectrum and other psychotic disorders. He has repeatedly self-medicated with drugs and alcohol as a means of dealing with his mental health problems,

16

which have increased his potential for acting out. His mental illness played a major role in his actions at the time of the alleged offense; therefore, he believes that Mr. Corzine would qualify for a guilty but mentally ill plea. Detective now Chief McWilliams testified that the defendant's friend, Dustin Kieffer, told him that days prior to the murder, he said he was hearing voices."

¶ 49 The circuit court sentenced defendant to 50 years of incarceration in IDOC with 3 years of mandatory supervised release.

¶ 50 On September 11, 2021, defendant filed a handwritten note requesting an appeal. He expressed that a 50-year sentence was unjust. He conveyed that he had previously sought help before someone was harmed and that he did not wish for Phelps to die. He emphasized his love for her. Furthermore, he claimed that the State attempted to portray him as a cold-blooded killer, whereas he considered himself a good man with a mental disability. He asserted that he did not believe he should spend his life incarcerated simply "because I'm different than other people." He stated that he did not receive a fair trial and conveyed his remorse for his actions.

¶ 51 On September 23, 2021, defense counsel filed a motion to reconsider sentence, asking that defendant be allowed to make a statement in allocution. Defense counsel also filed a certificate of compliance with Illinois Supreme Court Rule 604(d) (eff. July 1, 2017).

¶ 52 The matter was scheduled for a hearing on the same day. Defense counsel indicated that defendant did not make a statement in allocution because he was nervous, scared, and suffered from a "mental situation" that heightened his anxiety levels. Defense counsel acknowledged that he was not asserting any additional inaccuracies concerning the sentencing hearing and stated that he was "very appreciative on Ruben's behalf that the Court took such good notice of his mental health issues and the circumstances of the tragedy when you came up with your sentence." The

17

State objected, asserting that the motion for reconsideration was improper as it failed to allege any errors committed by the circuit court. The State emphasized that defendant had the opportunity to address the circuit court during the sentencing hearing in the presence of the family, and that permitting a statement now would be inappropriate. The circuit court allowed defendant to make a statement in allocution.

¶ 53　Defendant expressed a desire to apologize to the family, saying he had been reflecting on the situation for two years. He stated it was not his intention to cause these events and wanted to convey his remorse for what happened. He stated, "I tried to get help, but I just didn't. I didn't get it." He stated that Phelps was his best friend and that he loved her.

¶ 54　No argument of counsel was made. The circuit court denied the motion to reconsider.

¶ 55　On October 4, 2021, defendant filed a handwritten note to the circuit court, indicating his intention to appeal. He expressed that his attorney "must have done something wrong, or he didn't do all that he could have done for me. He must have missed something." Subsequently, a notice of appeal was filed on October 19, 2021. On August 23, 2022, we issued a summary order remanding the matter for a preliminary inquiry regarding defendant's posttrial claims of ineffective assistance of counsel, in accordance with *People v. Krankel*, 102 Ill. 2d 181 (1984).

¶ 56　A *Krankel* hearing was conducted on December 22, 2022. After hearing from defendant and defense counsel, the circuit court stated that defendant's assertions were without merit and related solely to trial strategy. It concluded that defendant's allegations did not demonstrate any potential neglect of the case. The circuit court further stated that defense counsel went above and beyond and handled and represented defendant appropriately. On January 26, 2023, defendant filed a handwritten note indicating his desire to appeal.

18

¶ 57                                    II. ANALYSIS

¶ 58     Defendant raises two issues on appeal. First, he argues that the sentence was excessive because he took responsibility for his crime by entering into a guilty plea, he had a history of mental issues, and the circuit court's emphasis on defendant's criminal history and the need for deterrence was misplaced. Second, he argues the circuit court erred because it improperly relied on a factor inherent in the offense of first degree murder. For the following reasons, we disagree with defendant.

¶ 59     The Illinois Constitution of 1970, article I, section 11, requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "A sentencing court must not only consider rehabilitative factors in imposing a sentence, it must also make rehabilitation an objective of the sentence." *People v. Wendt*, 163 Ill. 2d 346, 352-53 (1994). In fashioning an appropriate sentence, the trial court must consider defendant's " 'credibility, demeanor, general moral character, mentality, social environment, habits, and age' " and impose a sentence based on the circumstances of each case. *People v. Pina*, 2019 IL App (4th) 170614, ¶ 19 (quoting *People v. Fern*, 189 Ill. 2d 48, 53 (1999)). The court must also carefully consider the statutory factors in mitigation and aggravation. *People v. Center*, 198 Ill. App. 3d 1025, 1033 (1990). The court is not, however, required to recite and assign a value to each factor considered. *Pina*, 2019 IL App (4th) 170614, ¶ 19. There is a presumption that a circuit court considers all mitigating evidence presented. *People v. Abrams*, 2015 IL App (1st) 133746, ¶ 33.

¶ 60     A trial court's sentencing decision is entitled to great deference. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). Such deference is granted "because the trial court is generally in a better position than the reviewing court to determine the appropriate sentence." *Id.* "If a sentence falls

19

within the statutory limits, it will not be overturned on appeal absent an abuse of discretion." *People v. Bunning*, 2018 IL App (5th) 150114, ¶ 16. "An abuse of discretion occurs only if a sentence greatly varies from the spirit and purpose of the law or where it is manifestly disproportionate to the nature of the offense." *Id.*

¶ 61                          A. Mitigating and Aggravating Factors

¶ 62                              1. *Guilty Plea and Remorse*

¶ 63    Defendant contends that the circuit court failed to appropriately consider his open plea of guilty and his expressions of remorse when evaluating mitigating factors. He maintains that he pleaded guilty to first degree murder and threw himself on the mercy of the court "in order to do the right thing." Nonetheless, this claim is not supported by defendant's own statements.

¶ 64    First, during the plea hearing, when questioned about whether his medication might have influenced his capacity to sign a plea of guilty and waive his right to a jury trial, defendant responded, "I'm not sure exactly what to do, Your Honor. I've been thinking about it quite a bit. I just want the best outcome for me. I have children I'd like to make it back home to some day. And as far as the law goes, I'm not 100 percent sure on my decision." His remorse was notably absent here, as he referenced himself eight times and did not mention Phelps or her family. Subsequently, at the sentencing hearing, he did not make a statement in allocution. However, upon receiving a 50-year sentence, defendant filed a motion to reconsider, indicating that he now wished to make an allocution statement. Despite the State's objection, defendant was permitted to proceed; however, by that time, he had already been sentenced, and his intention to deliver an allocution to demonstrate remorse may no longer be regarded as the primary motivation for his action. He claimed that his failure to make an allocution statement during the original sentencing was due to

nervousness and anxiety. Nonetheless, after the sentence was imposed, he expressed remorse to Phelps's family.

¶ 65    At times, defendant expressed remorse; at other moments, he demonstrated self-interest. On appeal, defendant now claims altruism as his motivation for pleading guilty; however, he simultaneously reveals that his purported altruistic intentions are ultimately a strategy to reduce his sentence. Considering the nature and timing of defendant's purported "remorse," the circuit court did not abuse its discretion in imposing the sentence, as it could reasonably conclude that defendant had not demonstrated any remorse at that time. The only instance during the proceedings in which defendant referenced Phelps and his remorse was when he was under the circuit court's scrutiny, pleading for a reduced sentence. "[T]he court can consider defendant's remorse, or lack thereof ***." *People v. Nussbaum*, 251 Ill. App. 3d 779, 781 (1993). As it stands, the circuit court made no mention of defendant's remorse one way or another, and it can be assumed his silence neither helped nor hurt him.

¶ 66    Defendant further asserts that the circuit court committed error by not explicitly stating that it took into account his guilty plea as a mitigating factor. While "[a]dmission of fault has been recognized as a first step toward rehabilitation and should be treated as a factor in mitigation" (*People v. Pippen*, 324 Ill. App. 3d 649, 653 (2001)), it is not obligatory and is not enumerated as a factor in the statutory provisions. "The fact that the defendant pleaded guilty is not a statutory factor in mitigation." *People v. Hernandez*, 204 Ill. App. 3d 732, 740 (1990). The circuit court imposed a sentence of 50 years, which was 10 years less than the maximum and the State's requested term. "The trial court is not required to articulate each and every factor that it considers in rendering a sentence. However, that does not mean that it did not take all of the important and relevant factors into account." *People v. Villalobos*, 2020 IL App (1st) 171512, ¶ 74. "There is a

21

strong presumption that the sentencing court has considered all evidence of mitigation brought before it." *People v. Deaton*, 236 Ill. App. 3d 530, 547 (1992). The absence of specific mention by the circuit court indicating that it considered defendant's guilty plea does not equate to a failure to consider it.

¶ 67 In this case, contrary to the arguments presented on appeal, defendant did not reference Phelps or her family at any point before or during the sentencing hearing, but only did so during the hearing for his motion to reconsider his sentence. It was during that hearing, which aimed at seeking a reduction of his sentence, that defendant finally acknowledged Phelps and her family. The circuit court did not abuse its discretion by failing to mention defendant's remorse and guilty plea as mitigating factors, where his remorse is not evident in the record, and his guilty plea does not, in and of itself, necessitate a consideration of a specific mitigating factor.

¶ 68                                    2. *Mental Health*

¶ 69 Defendant next contends that the circuit court failed to acknowledge his history of mental health issues as a mitigating factor. The mitigation statute states in part, "At the time of the offense, the defendant was suffering from a serious mental illness which, though insufficient to establish the defense of insanity, substantially affected his or her ability to understand the nature of his or her acts or to conform his or her conduct to the requirements of the law." 730 ILCS 5/5-5-3.1(a)(16) (West 2018). In the present case, there was insufficient evidence indicating that defendant's mental illness substantially affected his ability to understand the nature of his acts or to conform his conduct to the requirements of the law.

¶ 70 First, defendant's account of the event to Dr. Cuneo significantly diverged from his account given to the police shortly after the incident. Dr. Cuneo conducted two interviews with defendant, in each of which defendant stated that, on the day in question, he had been hearing voices.

22

However, upon reviewing the police reports, Dr. Cuneo observed that during his interview with the police on the day of the incident, defendant did not mention hearing voices or hallucinations. Instead, he reported that he and Phelps became involved in an argument, during which Phelps "pushed his buttons." Defendant also stated that he grabbed a knife from the kitchen, and they "got into it." Notably, this initial account is corroborated by interviews with two of Phelps's sons, who were present prior to the incident and reported hearing an argument between Phelps and defendant. In any event, defendant's accounts of the events are inconsistent, he never informed Dr. Cuneo that he and Phelps argued, and he never told the police that he heard voices.

¶ 71   Dr. Cuneo, who conducted two interviews with defendant, expressed the opinion that defendant's claims of hallucinations during the incident "appeared extremely suspect." Moreover, he deduced that although defendant exhibited "a substantial disorder of thought, mood, and behavior" that affected him at the time of the incident and impaired his judgment, as well as negatively influencing his conduct, it was not to an extent that rendered defendant "unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." Dr. Cuneo further concluded that defendant was legally sane at the time of the incident.

¶ 72   Furthermore, the medical records from four hours prior to the incident do not support defendant's assertion. Defendant arrived at the hospital after ingesting unidentified pills provided by Phelps, believing he was experiencing a reaction. During his examination at the hospital, he was observed to be alert and oriented. The documentation for that visit does not indicate any complaints of hearing voices or hallucinations. Subsequently, 56 minutes after arriving at the emergency department, defendant left against medical advice. The report stated that defendant was alert, oriented, and coherent, and that he was leaving for personal reasons. Less than five hours later, following a dispute with Phelps, defendant killed her.

23

¶ 73    Although the circuit court did not explicitly identify defendant's mental health issues as a statutory mitigating factor, it allocated substantial time in its discussion to address them. It reviewed the fitness evaluations and Dr. Cuneo's reports, employing all pertinent information to substantiate a finding of guilty but mentally ill. In essence, the circuit court conducted a comprehensive analysis of the evidence submitted and utilized the information in a manner it deemed appropriate. As previously stated, a strong presumption exists that the circuit court considered all mitigating evidence brought before it. *Deaton*, 236 Ill. App. 3d at 547.

¶ 74    The circuit court's determination that there was no medical evidence indicating that defendant's mental illness substantially impaired his capacity to comprehend the nature of his actions in stabbing Phelps is substantiated by Dr. Cuneo's interview with defendant, police reports, and medical records. The statements made by defendant both prior to and following the incident lack any reference to hearing voices or hallucinations. It is only during his interviews with Dr. Cuneo, conducted seven months later and a year later, that defendant claims to have been hearing voices at the time of the incident, a claim that Dr. Cuneo remarked was "suspect." Having considered the totality of the evidence and defendant's history, the circuit court found him guilty but mentally ill. Defendant's assertion that the circuit court did not take his mental health issues into account is unfounded and not supported by the record, and the circuit court's imposed sentence was not an abuse of discretion.

¶ 75                      3. *Criminal History and Deterrence*

¶ 76    Defendant contends that the circuit court improperly considered defendant's criminal history and the necessity for deterrence as aggravating factors. The statute enumerating aggravating factors specifies these two considerations for the circuit court in determining an

24

appropriate sentence. See 730 ILCS 5/5-5-3.2(a)(3), (7) (West 2018). We find that the level of consideration the circuit court gave to these two factors did not constitute an abuse of discretion.

¶ 77    "The defendant's prior criminal history is *** relevant." *People v. Mitchell*, 213 Ill. App. 3d 1078, 1081 (1991). Defendant possesses a criminal history, commencing with a 2007 conviction for failing to identify a fugitive from justice. He has accumulated multiple drug-related charges and was incarcerated in IDOC in 2017 for possession of a weapon by a felon and reckless discharge of a firearm. An examination of his criminal history indicates a progressive escalation in the severity and violent nature of his offenses over the years.

¶ 78    The circuit court, during its recitation, explicitly articulated certain statutory aggravating factors, including deterrence. "[A] court may logically give reasonable consideration to the need for deterrence as a factor in the imposition of a sentence." *People v. Harris*, 231 Ill. App. 3d 876, 881 (1992). In the present case, Dr. Cuneo opined that defendant was sane at the time of the incident. In other words, Defendant was aware that his actions were unlawful. Medical records from a mere five hours prior to the incident further demonstrate that defendant was alert and oriented. Defendant inflicted 37 stab wounds upon Phelps and, rather than seeking immediate assistance, proceeded to a nearby convenience store where he smoked a cigarette, all while she was bleeding to death. It is appropriate to seek to deter others from committing knowing acts such as the homicide defendant stands convicted of, and to that end, the trial court appropriately concluded that a substantial sentence was warranted.

¶ 79    Defendant essentially asks this court to reweigh the sentencing factors, claiming that his 50-year sentence for first degree murder is excessive. While it is true a circuit court's sentencing discretion is "not unfettered" (*People v. O'Neal*, 125 Ill. 2d 291, 297 (1988)) and that the appellate court was never meant to be a "rubber stamp" for the sentencing decisions of the circuit court

25

(*People v. Woodson*, 2024 IL App (1st) 221172, ¶ 89), it is also axiomatic that this court "must not substitute its judgment for that of the trial court merely because [we might] have weighed" the pertinent sentencing factors differently. *Stacey*, 193 Ill. 2d at 209. A reviewing court's role is not to reweigh the sentencing factors or substitute its judgment for that of the trial court. *People v. Klein*, 2022 IL App (4th) 200599, ¶ 37. Here, the record reflects that the circuit court considered the evidence and arguments of the parties, the factual basis, the PSI, the history, character, and attitude of defendant, and the *relevant statutory factors in aggravation and mitigation*. The factors considered by the sentencing court provide a sufficient basis for the sentence imposed in this matter, and the circuit court's sentence was within the statutory sentencing range. For these reasons, we do not find that defendant's sentence was excessive or that the circuit court abused its discretion in sentencing defendant.

¶ 80                                   B. Double Enhancement

¶ 81    Defendant contends that the circuit court erred by relying on an element inherent in the offense of first degree murder in fashioning its sentence. Specifically, defendant argues that the court erroneously considered an aggravating factor as an element inherent in the offense of murder when it stated that defendant's conduct "caused the death of Jennifer Phelps. Thirty-seven stab wounds resulted in her death." One of the elements of first degree murder, as delineated in section 9-1(a)(1) of the Criminal Code of 2012 (720 ILCS 5/9-1(a)(1) (West 2018)), is that defendant caused the death of another individual. As such, defendant asserts that the circuit court's statement constituted an impermissible double enhancement and thus warrants a reduction in sentence or a remand for a new sentencing hearing. We, however, disagree.

¶ 82    "A double enhancement occurs when either (1) a single factor is used both as an element of an offense and as a basis for imposing a harsher sentence than might otherwise have been

imposed, or (2) the same factor is used twice to elevate the severity of the offense itself." *People v. Guevara*, 216 Ill. 2d 533, 545 (2005). "Generally, a factor implicit in the offense for which the defendant has been convicted cannot be used as an aggravating factor in sentencing for that offense, absent a clear legislative intent to accomplish that result." *People v. Ferguson*, 132 Ill. 2d 86, 97 (1989). The reasoning for the rule against double enhancement is "premised on the assumption that the legislature considered the factors inherent in the offense in determining the appropriate range of penalties for that offense." *People v. Rissley*, 165 Ill. 2d 364, 390 (1995). We review complaints of double enhancement *de novo*. *People v. Phelps*, 211 Ill. 2d 1, 12 (2004).

¶ 83                                                    1. *Waiver*

¶ 84    We observe initially that defendant did not raise an objection at the time the statement was made, nor was the issue articulated in a postsentence motion. "It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Hillier*, 237 Ill. 2d 539, 544-45 (2010). Illinois Supreme Court Rule 604(d) states that if a sentence is challenged, the defendant must file a motion to reconsider the sentence, which "shall state the grounds therefor," and that "[u]pon appeal any issue not raised by the defendant in the motion to reconsider sentence *** shall be deemed waived." Ill. S. Ct. R. 604(d) (eff. Apr. 15, 2024). Neither defendant's handwritten letter nor defense counsel's motion address the statements made by the circuit court during its judgment as being improper. Rather, defendant solely claimed that he wished to make a statement in allocution.

¶ 85    As discussed by the Illinois Supreme Court, any issue not raised in a postplea motion is waived on appeal. *People v. Ratliff*, 2024 IL 129356, ¶ 26. Because defendant did not challenge the circuit court's statement in his motion to reconsider, "the trial court did not have the

27

opportunity to address and correct any errors. Thus, the defendant's omission of that issue in his postplea motions waived consideration of it on review." *Id.* ¶ 28.

¶ 86                                              2. *Plain Error*

¶ 87      While this issue is waived, we will briefly address defendant's contention under the plain-error doctrine. "The plain-error doctrine is a narrow and limited exception." *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). To obtain relief under the plain-error doctrine, a defendant must first show that a clear or obvious error occurred. *Id.* "In the sentencing context, a defendant must then show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Id.* The defendant bears the burden of persuasion under both prongs of the plain-error doctrine. *Id.*

¶ 88      We first examine whether the alleged error can be reviewed under the second prong of a plain error analysis. " '[S]econd-prong plain error can be invoked only for structural errors ***.' " *People v. Johnson*, 2024 IL 130191, ¶ 91 (quoting *People v. Jackson*, 2022 IL 127256, ¶ 49). "[S]tructural errors affect the very framework within which the sentencing hearing proceeds, rather than mere errors in the sentencing process itself." *Id.* ¶ 89. "Because a sentencing court is required to weigh all the evidence and factors in aggravation and mitigation to determine a defendant's culpability in imposing the sentence (see 730 ILCS 5/5-4-1 (West 2018)), a structural error at sentencing is an error that renders the sentencing hearing itself an unreliable means of implementing that balance." *Id.* Here, the circuit court's alleged error of considering an improper factor in aggravation does not satisfy that standard because it did not affect the framework within which the sentencing hearing proceeded, but was at most an error in the sentencing process itself. *Id.*; see *People v. Moon*, 2022 IL 125959, ¶ 29. "Nor did the error undermine the integrity of the

judicial process or render the sentencing hearing fundamentally unfair." *Johnson*, 2024 IL 130191, ¶ 90.

¶ 89   Additionally, second-prong plain error is not subject to harmless error analysis. *Id.* ¶ 91 (quoting *Jackson*, 2022 IL 127256, ¶ 49). "In contrast, 'errors reviewable under the first prong of the plain error rule are the type of errors that are subject to harmless error analysis, and a defendant must establish prejudice resulting from the error to excuse his forfeiture of such an error.' " *Id.* (quoting *Jackson*, 2022 IL 127256, ¶ 23). Our Illinois Supreme Court has previously found that " 'the admission of improper aggravation evidence during a sentencing proceeding is subject to harmless-error analysis and reversal is not mandated in every instance.' " *Id.* (quoting *People v. Banks*, 237 Ill. 2d 154, 197 (2010)). Because defendant's assertion that the circuit court erred in considering an aggravating factor "is amenable to harmless error analysis, it follows that it is not a structural error and may not be reviewed under the second prong of the plain error rule, but it is reviewable under the first prong of plain error analysis." *Id.* ¶ 92. As a result, we turn to a first-prong plain error analysis—addressing first whether there was a clear and obvious error before determining whether a prejudice analysis is warranted.

¶ 90   When delivering its sentence, the circuit court initially referenced the mitigating factors statute and explicitly stated that none of the enumerated mitigating factors were applicable. Subsequently, it addressed the aggravating factor statute, commencing with the first factor listed therein, namely "the defendant's conduct caused or threatened serious harm." 730 ILCS 5/5-5-3.2(a)(1) (West 2018). More specifically, the circuit court articulated, "number one, that the defendant's conduct caused the death of Jennifer Phelps. Thirty-seven stab wounds resulted in her death." The defendant contends that this statement indicates the circuit court considered an inherent factor, thereby constituting error.

29

¶ 91    We initially observe that, when deciding whether the circuit court relied on an improper aggravating factor in its sentencing, our analysis considers " 'the record as a whole, rather than focusing on a few words or statements by the trial court.' " *People v. Denniston*, 2025 IL App (4th) 240381-U, ¶ 43 (quoting *People v. Dowding*, 388 Ill. App. 3d 936, 943 (2009)). Immediately following the contested statement, the circuit court noted, "[n]umber three, the defendant has a history of prior delinquency or activity, criminal activity." Subsequently, the court proceeded to number seven. In essence, the circuit court was simply listing the aggravating factors it considered relevant in the order they appear in the statute. A comprehensive reading of the court's recitation suggests that it systematically reviewed the statute and noted those factors it regarded as significant.

¶ 92    We recognize that "[i]t is impermissible for the circuit court to impose a more severe sentence on the ground that defendant caused the victim serious bodily harm, namely, death, because death is inherent in the offense." *People v. Benford*, 349 Ill. App. 3d 721, 734 (2004). Nevertheless, as previously noted, a court may consider the aggravating factor that "defendant's conduct caused or threatened serious harm." 730 ILCS 5/5-5-3.2(a)(1) (West 2018). "Where a court applies this aggravating factor, it may consider the force employed and the physical manner in which the victim's death was brought about, which comprehends the degree or gravity of defendant's conduct rather than the end result, that is, the victim's demise." *Benford*, 349 Ill. App. 3d at 734-35. This is precisely what occurred in the present case. Based upon a comprehensive review of the circuit court's remarks at the sentencing hearing, the court's reference to Phelps's death was an acknowledgment of the occurrence of a serious offense, given that defendant stabbed her 37 times. Defendant stabbed Phelps so hard that the knife bent. He then left her there to bleed to death while he went outside to take a walk and smoke a cigarette. "The reference by the court

30

does not reflect that it considered the murder as an aggravating factor; rather, the court merely was noting that 'defendant's conduct caused *** serious harm.' See 730 ILCS 5/5-5-3.2(a)(1) (West 20[18])." *Id.* at 735. Consequently, we determine that the circuit court "did not violate the principle that a factor inherent in an offense should not be considered as a statutory aggravating factor" (*id.*), and thus its statement was not clear and obvious error. "[W]ithout a finding of clear or obvious error, there can be no reversal under the plain-error doctrine." *People v. Anaya*, 2017 IL App (1st) 150074, ¶ 99. Therefore, had this issue not been waived, defendant still would not have received recourse under the plain-error doctrine.

¶ 93                                    3. *Ineffective Assistance of Counsel*

¶ 94    Defendant next asserts that he was deprived of the effective assistance of counsel because defense counsel failed to object to the circuit court's statement regarding the stabbing of Phelps and failed to include the contested statement in the motion to reconsider. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "[T]he proper standard for attorney performance is that of reasonably effective assistance." *Id.* at 687. "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88. "[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688.

¶ 95    "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. "Because

31

of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.]" *Id.* "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client the same way." *Id.* "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. *** Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Id.* at 691-92.

¶ 96    "When addressing a claim of plain error and an alternative claim of ineffective assistance of counsel, appellate courts first consider whether the defendant has established a clear or obvious error. 'Absent a clear or obvious error ***, neither the doctrine of plain error nor a theory of ineffective assistance affords any relief from the forfeiture.' " *People v. Gilker*, 2023 IL App (4th) 220914, ¶ 78 (quoting *People v. Jones*, 2020 IL App (4th) 190909, ¶ 179). Therefore, since we determined that there was no clear or obvious error in the circuit court's statement regarding the gravity of defendant's actions, defendant's claim of ineffective assistance of counsel similarly provides him no relief, as there was no error to object to or to include in his motion.

¶ 97                                   III. CONCLUSION

¶ 98    For the foregoing reasons, we affirm the sentence imposed by the Wabash County circuit court.


¶ 99    Affirmed.